UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| **SHANE DOUGLAS BELL,**<br><br>Plaintiff,<br><br>vs.<br><br>**DARIN YOUNG**, Warden, individual and official capacity;<br>**JENNIFER DREISKE,** Deputy Warden, individual and official capacity;<br>**DENNIS KAEMINGK**, Secretary of Corrections, individual and official capacity;<br>**BOB DOOLEY**; Director of Prison Operations, individual and official capacity;<br>**CRAIG MOUSEL**, Correctional Officer, individual and official capacity; and<br>**SCO MOISAN**, individual and official capacity,<br><br>Defendants. | 4:16-CV-4046-VLD<br><br>MEMORANDUM OPINION AND ORDER<br><br>(DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DOCKET #108) |

**INTRODUCTION**

This matter is before the court on plaintiff Shane Douglas Bell's amended complaint pursuant to 42 U.S.C. § 1983. <u>See</u> Docket 89. The defendants have moved the court for summary judgment in their favor. <u>See</u> Docket 108. The parties have consented to this magistrate judge handling their case pursuant to 28 U.S.C. § 636(c).

# FACTS

Pursuant to FED. R. CIV. P. 56(c) and Local Rule 56.1, the defendants submitted a statement of undisputed material facts (Docket 116). The plaintiff submitted a response (Docket 124) indicating whether he admitted or disputed each of the defendants' facts. In that same document (Docket 124) the plaintiff also submitted 59 additional facts which he asserts are material. The defendants have not disputed these additional facts. The facts below merge the defendants' statement of undisputed facts, the plaintiff's response to the same, and the plaintiff's statement of additional material facts.

## A.    Parties

Plaintiff, Shane Douglas Bell, is and has been at all time relevant to this lawsuit an inmate at the South Dakota State Penitentiary (SDSP) in Sioux Falls, South Dakota.

Defendant Darin Young is the Warden of the SDSP. Defendant Young has been the Warden of the SDSP since May 24, 2013.

Defendant Jennifer Dreiske is the Deputy Warden at the SDSP and has served in that position since March 26, 2013.

Defendant Denny Kaemingk is the South Dakota Secretary of Corrections and has served in that position since May 2, 2011.

Defendant Bob Dooley was the Warden of the Mike Durfee State Prison (MDSP) in Springfield, South Dakota and also served as the Director of Prison Operations for the South Dakota Department of Corrections (SDDOC).

Mr. Dooley had served as the Director of Prison Operations for the SDDOC since June, 2013.[1]

Defendant Moisan is a Senior Correctional Officer at the SDSP.

Defendant Craig Mousel is a correctional officer as the SDSP. CO Mousel has been employed by the SDDOC since August, 2007 and has at all times relevant to this lawsuit served as a property officer at the SDSP.

Mr. Bell brings this lawsuit against all defendants in both their official and individual capacities.

**B.    Mr. Bell's Amended Complaint**

Mr. Bell's amended complaint (Docket 89) alleges four causes of action. Mr. Bell seeks declaratory and prospective injunctive relief pursuant to 42 U.S.C. § 1983 (p. 1) as well as Mr. Bell's attorney's fees (p. 16) based upon the alleged violation of his First Amendment rights, his right to be free from unlawful retaliation, and his right to equal protection under the law (class of one). See Docket 89, p. 1.

In count one, Mr. Bell alleges a violation of his First Amendment right to receive mail. Docket 89, p. 8. Mr. Bell does not specifically name any defendants in this cause of action, but generally refers to "the defendants." However, in the factual allegations which he asserts pertain to all counts in the amended complaint, Mr. Bell alleges that defendant Mousel, acting is his capacity as the property officer, is the individual who rejected Mr. Bell's books when the books arrived in the prison mail room. Mr. Bell asserts defendant

_____

[1] Warden Dooley retired on June 8, 2018. Brent Fluke assumed the position on June 9, 2018.

3

Mousel is the person who completed the "Supply Correspondence Rejection Notice" form advising Mr. Bell that the books in question were not delivered to him because the books violated prison policy. See Docket 89, ¶¶ 21-22. The named defendants who responded to Mr. Bell's grievances regarding the rejected books are Jennifer Dreiske and Warden Young. See Docket 1-1, p. 52.

This cause of action alleges the defendants' policy regarding incoming mail is facially invalid because it rests upon distinctions between "new," "used," and "donated" books which are vague and overbroad. Id. Mr. Bell further alleges that such distinctions are not rationally related to a valid penological interest. Id.

Alternatively, Mr. Bell asserts the policy is invalid as it has been applied to him. Docket 89 at pp. 8-9. Mr. Bell alleges that as it has been applied to him, the policy is so arbitrary and capricious as to constitute a violation of his First Amendment right to receive mail. Id. at p. 9.

Mr. Bell alleges the right to be free from selective and arbitrary enforcement of putatively neutral prison mail policies is clearly established, and any reasonable prison official should understand that a prisoner is entitled to be free from selective enforcement of such policies. Id.

In count two, Mr. Bell alleges that on its face, the SDSP and SDDOC pornography policy is unconstitutionally vague and overbroad. Docket 89, p. 10. Again, Mr. Bell does not bring this cause of action against any specific defendant, but generally alleges the defendants have violated his constitutional rights. A reading of the allegations which Mr. Bell asserts pertain to all causes

4

of action, however, reveal that defendant Moisan rejected Mr. Bell's May, 2016, issue of *Military History* magazine based upon her interpretation of the SDDOC pornography policy. Unit Coordinator (UC) Hughes affirmed defendant Moisan's decision when UC Hughes rejected Mr. Bell's informal resolution request. Docket 89, ¶ 35. UC Hughes is not a party to this lawsuit. Also, defendant Warden Young affirmed this decision by rejecting Mr. Bell's request for administrative remedy. Docket 1-1, p. 30. Mr. Bell asserts the prison officials who are charged with enforcing the policy are unable to meaningfully differentiate between material that is prohibited by the terms of the policy and material that is allowed under the exceptions articulated by the policy. Docket 89, ¶ 75.

Alternatively, Mr. Bell asserts that even assuming the pornography policy is valid on its face, the policy has been unconstitutionally applied as to him. As an example, Mr. Bell asserts the policy was applied in an unconstitutional manner when the defendants refused to allow him to have the May, 2016, issue of *Military History* magazine. Docket 89, p. 5. Mr. Bell asserts that his administrative appeals regarding *Military History* were ruled upon by prison officials who had never seen the rejected magazine and therefore, could not have made an independent review of the allegedly offensive material. Id. Therefore, Mr. Bell alleges, the documented reasons for the rejection of the magazine are suspect and there is no rational relationship between the policy and the defendants' actions. Id.

Mr. Bell further alleges that the images contained within the *Military History* magazine should have fallen within one of the exceptions contained within the pornography policy because the image had extrinsic value. Mr. Bell asserts the defendants' denial of the *Military History* magazine adversely affected his First Amendment rights.

In count three, Mr. Bell alleges the defendants retaliated against him for exercising his constitutional rights. Docket 89, p. 11. Again, Mr. Bell does not name specific defendants in count three. The court therefore reviews the general allegations to discern the identities of the actors responsible for the actions Mr. Bell asserts were taken for a retaliatory motive.

Mr. Bell alleges he filed a previous lawsuit against prison officials in 2014 ("the 2014 lawsuit"). Id. He further alleges that, before he filed the 2014 lawsuit, he was allowed to receive books from various publishers without purchasing them ("donated books"). Id. Mr. Bell alleges that after filing the 2014 lawsuit, he was no longer allowed to receive the same donated books he was previously allowed to receive, ostensibly pursuant to OM 2.3.C.4. Docket 89, p. 12.

Mr. Bell alleges in count three that the SDDOC policy regarding a prisoner's conditional right to receive books has been arbitrarily and selectively enforced against him in a discriminatory manner, and that the timing and circumstances of the manner in which the policy has been enforced establish a causal nexus between his protected activity and the adverse action (rejecting books sent to him through the mail.). Docket 89, p. 12. Because the only

named defendant who is alleged to have been involved in Mr. Bell's receipt/rejection of books is defendant Mousel, the court understands Mr. Bell's retaliation claim to be made against defendant Mousel. Mr. Bell asserts the selective and arbitrary enforcement of OM 2.3.C.4 is direct evidence of the defendants' unlawful retaliation against him for filing the 2014 lawsuit.

Mr. Bell also alleges he has been subjected to retaliation because he was denied access to "kite" forms for the purpose of filing grievances. Docket 89, ¶ 58. Mr. Bell does not specify in his amended complaint who denied him the forms. Id. Mr. Bell's grievance forms, however, indicate that the person who he claims denied him grievance forms was UC Steinecky, who is not a named defendant in this lawsuit. See docket 109-1, p. 1. The persons who responded to Mr. Bell's grievance regarding UC Steinecky's alleged refusal to provide Mr. Bell with the forms were Krista Bast (not a named defendant in this lawsuit) and defendant Warden Young. See Docket Nos. 109-2, 109-4 and 109-8.

In the section of his amended complaint which articulates facts applicable to all claims, Mr. Bell alleges he was involved in an altercation on February 1, 2017, and that, based on how he was treated after the altercation, he believes prison staff retaliated against him. Docket 89, p. 12. He also claims staff failed to investigate or intercede on his behalf to stop unlawful misconduct. Id. Again, the amended complaint does not name the "prison staff" to which Mr. Bell refers.

In support of their motion for summary judgment, the defendants submitted the affidavits of April Smythe (Docket 110); John Benting (Docket 111); Randy Flick (Docket 114); and Ring Kuol Arop (Docket 115). None of these individuals are named defendants in this lawsuit. Officer Flick was he senior CO who observed the "chow hall" fight between Mr. Bell and the other inmate. Docket 114, ¶ 3. CO Arop is he officer who broke up the fight and escorted Mr. Bell to the holding cell, giving him a security gown in place of his regular prison clothes. Docket 115, ¶¶ 9-11. John Benting is the supervisory officer at Jameson Prison Annex (JPA) who approved of Mr. Bell being placed in a holding cell after the February 1, 2017, "chow hall" fight and approved of Mr. Bell being given only a safety gown to wear, per SDDOC Policy 1.4.E.7. Docket 111, ¶¶ 7-8. April Smythe is a Licensed Practical Nurse (LPN), employed by the SDSP. Docket 110, ¶¶ 1-2. She provided medical care to Mr. Bell after the February 1, 2017, "chow hall" fight. Id. at ¶¶ 4-12.

Mr. Bell alleges that a reasonable person in his position would be dissuaded from engaging in protected activity if subjected to such a pattern of retaliatory conduct. Id. He further alleges the defendants have failed to intervene or have been deliberately indifferent to retaliatory conduct by their subordinates. To the extent this is intended to allege supervisory liability, the court interprets this portion of the retaliation claim to be alleged as against Warden Young, Assistant Warden Dreiske, and Secretary Kaemingk.

In count four, Mr. Bell alleges a violation of his right to equal protection under the Fourteenth Amendment by creating a "class of one." Docket 89,

pp. 13-14. Mr. Bell alleges his right to be free from being "singled out and targeted" for exercising his constitutional rights and engaging in protected activity was clearly established at the time in question. Docket 89, p. 13.

Again, Mr. Bell does not name any specific defendants in count four of his amended complaint. The specific actions he cites, however, are the same actions he cites in support of his retaliation claim.

## C.    Claim-Specific Facts Supported by the Record

The court allowed limited discovery to flesh out Mr. Bell's claims in a manner sufficient to determine whether the defendants are entitled to qualified immunity in this civil rights action. <u>See</u> Docket 96. In their statements of fact, the defendants and Mr. Bell have referred to the affidavits of the parties and to (among other things) the discovery which was produced in support of their relative positions. In this section, the court draws upon the record evidence as highlighted by parties' statements of fact to glean the information relevant to each claim in Mr. Bell's amended complaint.[2]

### 1.    Count 1: First Amendment Claim (Right to Receive Mail— Policy OM 2.3.C.4)

At the heart of this claim is SDDOC Operational Memorandum (OM) 2.3.C.4. The policy is in the record in its entirety at Docket 52-1. More specifically, the application of that portion of OM 2.3.C.4 which pertains to

---

[2] In their respective statements of fact, the parties did not separate the facts by the claims to which each is relevant. Some facts are obviously relevant to more than one of Mr. Bell's claims. For ease of reference, the court has separated the facts in this opinion based upon the counts in Mr. Bell's complaint to which it *appears to the court* the parties argue they are most relevant. That a fact has been so categorized by the court does not render it mutually exclusive to being relevant to other counts.

obtaining personal property (incoming books in the mail) is the portion of the policy at issue in this lawsuit. That portion of the OM states as follows:

**Inmates:  Obtaining Allowed Personal Property**
**\*\***
**G.**

    **4**.    **Possession of Books:**

        **a.**    Hardcover books for individual or group use are not allowed. All books, regardless of purpose or subject matter, must be softcover. All hardcover books that are already inside the institution may remain, but no new hardcover books will be allowed.

        **b.**    Only new books sent to an inmate directly from a centralized retailer, warehouse, distributor, dealership, or publisher are allowed. New books not purchased in this manner will not be accepted.

        **c.**    Family members, friends, visitors, or others are not permitted to send books to an inmate.

The defendants in this lawsuit do not contest that they understand a prisoner has a clearly established right to receive books and periodicals in the mail free of censorship, unless the materials are excluded or rejected pursuant to policies that are reasonably related to legitimate penological interests. <u>See</u> responses to requests for admissions (Docket 126-1, p. 2). The defendants assert this OM is implemented to promote security and order within the SDSP. Defendant Mousel's two affidavits (Docket Nos. 57 and 85) and deposition testimony make clear the policy is not enforced as written. Specifically, while it is true that only *new* books are allowed, it is not true that only *purchased* books are allowed.

When CO Mousel first began his duties as a property officer, he was taught that all donated books were allowable so long as they were new (and not in violation of other penitentiary rules, such as the pornography policy). Mr. Bell asserts the exhibits he has presented to the court (Docket Nos. 77-4 through 77-11) represent property receipts for books he was allowed to receive in 2015 and 2016 that were donated books. Docket 77, ¶ 5.

At some point in time, however, this informal exception to the policy was modified so that prisoners are allowed to receive donated books only if they are new books received from a religiously affiliated organization. All other books coming into the SDDOC facilities intended for individual inmates must be purchased. Mousel affidavit, Docket 85, ¶¶ 6-12; Mousel deposition, p. 24.

In the responses to Mr. Bell's requests for admissions (Docket 126-1) the defendants contradict the application of OM 2.3.C.4 as it was explained by defendant Mousel during his deposition. Specifically, Warden Young avers in the defendants' requests for admissions that donated books, even if they are new, are allowed into the facility only if they are received directly from a centralized retailer, warehouse, distributor, dealership or publisher, but donated books cannot be given directly to the inmate. Instead, the donated new books are placed in the prison library or school. Id. Books that are donated to religious groups are placed in the chapel libraries where they are available to all inmates. Id. Warden Young further explains that family and friends may purchase books for an inmate, but the books must be purchased

through the bookstore or publisher and sent directly to the inmate from those entities. Id.

Though Warden Young asserts that allowing inmates to receive books from "unidentified sources" outside the institution would create "serious security and administrative problems," (Young affidavit, Docket 56, ¶ 8) there is no evidence in this lawsuit that Mr. Bell's rejected books were from "unidentified sources." The rejected shipment in February, 2016, came from Parallax Press (Docket 1-1, pp. 46), and other rejected shipments came from the Prison Literature Project, c/o Bound Together Bookstore in November, 2015 (Docket 1-1, p. 17) and February, 2016 (Docket 1-1, p. 52). In his affidavit, Mr. Bell avers that, at least as to the Parallax Press books, they were new books. See Docket 49. It is unclear whether the books from Bound Together Bookstore were new, though inmates have the option to specify they wish to receive exclusively new books from this source if their institution only allows new books (see Docket 1-1, p. 36) and Mr. Bell claims he requested to receive exclusively new, softcover books from this free book program. See Docket 52-2.

Mr. Bell asserts his books were rejected because they were *donated* from a non-religious source. In his deposition, defendant Mousel conceded that if a book is donated instead of purchased, it is automatically deemed "used" rather than "new" for purposes of OM 2.3.C.4. Mousel deposition at pp. 86-87. Mr. Bell further notes that though OM 2.3.C.4 is silent regarding religion, in practice a religious group sending a book with religious content may send

inmates free books, while other, non-religious groups may not send inmates free books. Mousel deposition at 69-70. This is true whether the non-religious group wishes to send books whose content is religious or non-religious. Mousel deposition at 70, 72, 74-75.

Mr. Bell, who asserts he is Buddhist, explains the defendants rejected a book sent to him ("Past Lives,") using different criteria than were being applied to Christian texts coming into the institution at that same time. <u>See</u> Docket 1-1 at 44; Mousel deposition at 69-70; Docket 1-1 at 44, 53-54. Mr. Bell was informed that the book "Past Lives" was rejected because it was deemed not a new book received directly from a dealership, publisher, or bookstore. Docket 1-1, at p. 45. But, Mr. Bell argues, books received during this same time from Christian organizations were routinely accepted, including books not sent directly from a dealership, bookstore or publisher. See Docket 1-1, p. 60.

Defendants have not articulated what heightened security and administrative problems are presented by *donated* new books versus *purchased* new books whose source is a non-religious centralized retailer, warehouse, distributor, dealership, or publisher. In his deposition, defendant CO Mousel attempted to explain that it is "less likely" that contraband would be smuggled into the institution though new books that are donated by a religious source than new books donated by a non-religious source. Mousel deposition at 91-92. No defendant has offered any reasoning whatsoever behind the theory that

contraband is more likely to be smuggled through a donated, new paperback[3] book from any non-religious source that is otherwise acceptable pursuant to OM 2.3.C.4 (in other words, a centralized retailer, warehouse, distributor, dealership, or publisher) than from a religiously affiliated one.

In his affidavit (Docket 56), Warden Young explains he is aware of past instances in which contraband was smuggled into the SDSP through used books.  Id. at ¶ 10.  Warden Young does not claim contraband has been smuggled in to a South Dakota DOC facility through new, donated books.  In fact, Warden Young explains that new, donated books are placed in the prison chapel and library for all inmates to enjoy.  Docket 126-1, p. 4.  Warden Young also avers it would be burdensome for prison staff to inspect books from sources other than publishers, dealerships, or distributors.  Docket 56 at ¶ ¶11, 14-15.  Neither Warden Young nor any of the other defendants have explained why new, *donated* books that originate from publishers, dealerships, or distributors are more burdensome on prison staff to inspect than new, *purchased* books that originate from publishers, dealerships, or distributors.  Likewise, neither Warden Young nor any of the other defendants have explained why donated new books from a religious source are actually less likely to contain contraband than donated new books from non-religiously affiliated publishers, dealerships, or distributors.

---

[3] In his affidavit, Warden Young referred to security problems presented by hardback books.  See e.g. Young affidavit (Docket 56), ¶¶ 16-17.  There is no evidence in the record that the books that were donated for Mr. Bell from Bound Together Bookstore or Parallax Press were hardback books.

**2.     Count 2:  First Amendment Claim (Policy 1.3.C.8-Pornography)**

On May 22, 2015, the  South Dakota DOC issued a revised pornography

policy (Policy 1.3.C.8—Pornography).  The policy prohibits the purchase,

possession, attempted possession and manufacturing of pornographic

materials by offenders housed in South Dakota DOC institutions.  Section III of

the policy contains definitions and states as follows:

**III Definitions:**
    **Pornographic Material:**
    Includes books, articles, pamphlets, magazines, periodicals,
    publications or materials that feature nudity or "sexually
    explicit" conduct.  Pornographic material may include books,
    pamphlets , magazines, periodicals, or other publication
    material that features or includes photographs, drawings,
    etchings, paintings, or other graphic depictions of nudity or
    sexually explicit material.

    **Nudity:**
    "Nudity" means a pictorial or other graphic depiction where
    male or female genitalia, pubic area, buttocks, or female
    breasts are exposed.  Published material containing nudity
    illustrative of medical, educational or anthropological
    content may be excluded from this definition.

    **Sexually explicit:**
    "Sexually explicit" includes written and/or pictorial, graphic
    depiction of actual or simulated sexual acts, including but
    not limited to sexual intercourse, oral sex or masturbation.
    Sexually explicit material also includes individual pictures,
    photographs, drawings, etchings, writings or paintings of
    nudity or sexually explicit conduct that are not part of a
    book, pamphlet, magazine, periodical or other publication.

Also pertinent to the issues in this lawsuit is Section IV of the policy:

**IV PROCEDURES:**
    **1.     Purchase, Possession and/or Attempted Possession**
        **of Pornographic Material:**
    A.     Any pornographic material is considered contraband.
\*\*\*

**2. Institutional Guidelines:**

A. Each institution's Warden or Superintendent will ensure procedures are in place to prevent pornographic material from being brought into an institution(s) under their authority. Such procedures will encompass at a minimum:

1. Prevention of the introduction or movement of pornographic material through correspondence or visits (See DOC policies 1.5.D. 1 Inmate visiting, 1.5.D.2 Juvenile Visitation and Telephone Contact and 1.5.D.3 Offender Correspondence).

a. All incoming and outgoing correspondence or publications depicting pornography or containing pornographic material will be rejected (See DOC policy 1.5.D.3 Offender Correspondence).

Other than receiving a copy of this pornography policy, prison staff do not receive any training on how to apply it. The same is true for OM 2.3.C.4. Defendants' response to Interrogatories at ¶ 5; Mousel deposition at pp. 16-17; Moisan deposition at pp. 11-12. The pornography policy is "all or nothing," meaning if any portion of a book or magazine offends the policy, the entire book or magazine is rejected. Mousel deposition at pp. 43-44.

The exceptions to the pornography policy are: nudity illustrative of medical, educational or anthropological content. <u>See</u> above. Personnel charged with applying these exceptions, however, could not articulate what they meant with the exception of anthropological content. Moisan deposition at p. 18; Mousel deposition at pp. 41-42; 78. CO Moisan testified she has been employed by SDSP for eleven years and has never applied any of the exceptions. Moisan deposition at pp. 17, 22. As far as she is aware, if a publication contains nudity, it is not allowed, period. <u>Id.</u> at pp. 25-26. She

16

believes this is the interpretation of the policy which is endorsed by her supervisors.  Id.

The prison staff who determine whether the enumerated exceptions to the policy should apply do not consider any individual characteristic of the recipient (course of study, interest, intellectual pursuit) to determine whether the exceptions should apply.  Mousel deposition at p. 44.

On February 29, 2016, a magazine Mr. Bell had ordered (the May, 2016, issue of *Military History*) was rejected by the prison mailroom staff.  The magazine was rejected because it contained material that was deemed sexually explicit.  Docket 1-1, p. 32; Docket 89, ¶ 33.  Specifically, the magazine contained (on page 25) a reproduction of a painting of a Turkish battle scene that includes a depiction of a bare-breasted woman.[4]  Docket 109-15.  The material within the magazine which was deemed contrary to Policy 1.3.C.8 was a copy of a painting of a group of distressed people lying on the battlefield, in what appears to be the aftermath of a battle.  Id.  One of the people was a bare-breasted woman holding a small child.  Id.

Mr. Bell grieved the rejection of this magazine, and argued it did not contain sexually explicit material because "any kid can buy this magazine."  Docket 1-1, p. 35.  His grievance was denied based upon the language of policy

---

[4] The painting is *The Massacre at Chios*, by Eugene Delacroix unveiled in 1824 at the Paris Salon.  The painting is credited with turning public opinion in Europe against the Ottoman Turks and generating support for Greek self-rule.

1.5.D.3.[5]  Docket 1-1, p. 34.  Mr. Bell now asserts the drawing contained within the May, 2016, *Military History* magazine should have come within one of the exceptions to the definition of "nudity" within Policy 1.3.C.8, or that prison personnel who screened the magazine should have at least considered the exceptions as applied to the May, 2016, *Military History* magazine before rejecting it outright.  He did not, however, make this claim during the prison grievance process.  Docket 1-1, pp. 16, 35.

The defendants assert this drawing (Docket 109-15),  if allowed within the SDSP, would in all likelihood find its way into the hands of inmates who are sex offenders, because inmates have been known to barter pornographic materials in the past.  Young affidavit, Docket 56, ¶ 28.  Mr. Bell disputes as wholly conclusory and speculative Warden Young's claim that such a drawing would be bartered into the hands of a sex offender.  Mr. Bell questions this conclusion because the document in this issue of *Military History* is a historic period drawing, and the defendants have presented no evidence that such a drawing would likely be bartered as pornography.

Since Mr. Bell first filed his complaint in this lawsuit, the defendants have continued to deny him access to periodicals and at least one book, based on Policy 1.3.C.8.  For example, in June, 2017, defendants denied Mr. Bell's receipt of the July/August issue of *National Geographic History.*  CO Moisan

---

[5] Policy 1.5.D.3-Offender Correspondence, Section IV.8.A.10 provides that items such as postage stamps, maps, calendars, and stickers will be rejected if received in incoming inmate mail.  Section IV.8.A.12 of the policy provides that material depicting pornography or sexually explicit conduct and/or nudity as those terms are defined by DOC Policy 1.3.C.8—Pornography, will be rejected.

determined an image on page 73 of that magazine was sexually explicit.  The

page in question was a picture of a statuary of Queen Nefertari, an Egyptian

monarch from the 16th century B.C. that is currently housed in the Lourvre in

Paris, France.  The statuette shows an adult female with bare breasts.

Attachment to Hagen affidavit, Docket 126-7.  After this magazine was rejected,

Mr. Bell filed a request for administrative remedy, explaining that he believed

the magazine should be exempt from Policy 1.3.C.8 because of its

anthropological and educational content.  Docket 126-6.

In August, 2017, another issue of *National Geographic History* magazine

was rejected from Mr. Bell's incoming mail.  Mr. Bell filed an informal

resolution request stating his belief that this rejection was in retaliation for his

lawsuit.  Docket 126-8.

On August 28, 2017, defendant Mousel rejected another incoming parcel

of mail intended for Mr. Bell.  This parcel was a book entitled *Special

Operations Force Medical Handbook.*  The ground stated for rejecting this book

was that it contained nudity.  The front cover of the book shows Da Vinci's

Vitruvian man, and there are medical diagrams of the human anatomy

(including male genitalia) in the text of the book.  Docket 126-9.

On August 29, 2017, Corporal Miller-Hunhoff (a non-party to this suit)

denied Mr. Bell receipt of the November, 2017, issue of *Military History*  on the

grounds that page 60 was sexually explicit.  Docket 126-10.

The defendants maintain a document entitled "inter-facility publications

rejection log" that tracks the incoming publications that are rejected from the

mailroom.  Docket 126-11.  This document tracks the name of the publication,

the date or issue of the publication, the reason it was rejected, the facility, and

in some instances, the officer who rejected the item.  Id.  Mr. Bell notes that

before he started this lawsuit in June, 2016, no issues of *National Geographic

History* were rejected, but after he started this lawsuit, three issues of *National

Geographic History* were rejected.  See Docket 126-11.[6]   Mr. Bell also notes

that the November, 2017, issue of *Military History* magazine which was rejected

in August, 2016, is not noted in the publication rejection log.  Docket 126-11.

Mr. Bell also asserts the Bible has been exempted from the plain

language of  Policy 1.3.C.8 even though the Bible contains written passages

that are "sexually explicit" as that term is defined in the Policy.  See Moisan

deposition at p. 29-30 (discussing Genesis 38:8-10, which describes

masturbation).  Specifically, Mr. Bell asserts the Bible is allowed within SDSP

even though CO Mousel acknowledged it should not be if it contains a written

description of masturbation, under Policy 1.3.C.8.  Mousel deposition at p. 57;

Moisan deposition at 29.  CO Moisan testified that a written description of

masturbation is "always" sexually explicit.  Moisan deposition at p. 23.  Yet, the

Bible is not excluded from  SDSP institutions.

---

[6] It is unknown whether Mr. Bell ever subscribed to or successfully received
*National Geographic History* before he commenced this lawsuit or his previous
lawsuit.  It is also unknown whether any other inmates successfully received or
have been rejected *National Geographic History* (or any of the other publications
which have been rejected for Mr. Bell) at any time relevant to this lawsuit.

### 3. Count 3: Retaliation Claim

In December, 2015, Mr. Bell was notified during the pendency of the appeal of his 2014 lawsuit that he would not be allowed to receive two donated books from Parallax Press. The reason cited for the rejection of these books was that their receipt by him violated a "prohibited act or any other rule, regulation or directive governing the DOC or this facility." The policy cited by the defendants for this rejection of donated books in December, 2015, is OM 2.3.C.4. Mr. Bell, however, has provided the court with property receipts (Docket Nos. 77-4 through 77-11) which he avers are copies of receipts for books he previously received in prison through the mail that were donated books—all while the very same policy was in effect. See Docket 77, ¶¶ 5-7.

Mr. Bell also directs the court's attention to the affidavit and deposition testimony of defendant CO Craig Mousel. Mr. Mousel has submitted two affidavits and given a deposition in this lawsuit. See Docket 57 (first affidavit); Docket 85 (second affidavit); and Docket Nos. 126-3, 109-16 (deposition excerpts). CO Mousel explained that OM 2.3.C.4 has not been consistently applied during his tenure.

Specifically, when CO Mousel began his duties as property officer at the SDSP, he was under the impression that there was an unwritten "exception" to OM 2.3.C.4. Mousel deposition, p. 22-24, 65. The exception was, that if the non-purchased (donated) book which was sent to the inmate was (or at least looked) new, it could be accepted. Id. Even though that practice did not square with the policy as it was written, CO Mousel testified he did not know

why things were done that way, but "that's the way it was." Mousel deposition, p. 29. CO Mousel testified, however, that many times he could not discern whether incoming books were purchased or donated. Id. at p. 31. Regarding the property receipts that Mr. Bell placed into evidence, CO Mousel testified that he could not tell whether those books were purchased or donated. Id. Regarding the program through which many of the donated books were previously received, CO Mousel explained that many of the books that arrived at the prison through that program looked "beat up and used," but many looked as if they had "never been opened." Id. at p. 14. His practice was to allow the ones that looked new, and reject the ones that looked used. Id. Even when books are purchased, however, there is not always a receipt enclosed when they arrive in the mailroom definitively indicating the book has been purchased. Id. at p. 32.

At some point in time, however, that unwritten exception narrowed further so that publishers and other prison donation programs in general could no longer donate new books to prisoners. Instead, only religiously affiliated groups could donate new books to prisoners. Id. at 24, 67. The rationale offered by CO Mousel for this restriction on donated new books is that contraband might be smuggled in with donated books. Mousel deposition at 91. Mousel asserts this is less likely to happen if the entity donating the book is religiously affiliated. Id. at 92.

Defendant Mousel's first affidavit (Docket 57) was submitted in November, 2016. At that time, he had been the supply officer for

approximately three years.  Id. at ¶ 1.  In his deposition, CO Mousel explained
that when he first started as the supply officer, he was trained by Officer
Hanson, so he (Mousel) did things the same way Officer Hanson did.  Mousel
deposition at p. 65.  Later, when an inmate complained, CO Mousel inquired to
Deputy Warden Dreiske about whether the policy was being implemented
correctly.  Id. at p. 14;  Mousel affidavit (Docket 85) at ¶¶7-12.  Deputy Warden
Dreiske informed CO Mousel that incoming books must be purchased.  Mousel
deposition at p. 14.  The policy was informally modified again to allow donated
new books, but only if the books came from a religiously affiliated source.  Id.
During his deposition, CO Mousel estimated that this informal policy change
occurred in September, 2016.  Mousel deposition, p. 67  (Docket 109-16, p. 9).

The defendants agree that they understand it is a violation of prison
policy, as well as the terms of their employment, to refuse to process an
inmate's grievance form.  Response to request for admissions (Docket 126-1) at
p. 5).  They do not agree, however, that the prison grievance procedure, in and
of itself, confers any substantive rights upon Mr. Bell.  Id.  The defendants also
agree that it is a violation of prison policy to induce or direct other inmates to
threaten or harass Mr. Bell or to knowingly allow such behavior.  Id.

Though Mr. Bell asserts prison officials have retaliated against him as a
result of his 2014 lawsuit by denying him access to "kite" forms which are
required for him to file prison grievances, Mr. Bell's institutional file reveals he
filed over fifty grievances between April, 2016, and April, 2017.  Maturan
affidavit, Docket 112, ¶ 4.  Many of the grievances Mr. Bell has filed consist of

his complaint that he has not been properly given grievance forms.  Id. ¶ 5.  On at least one of these occasions, the staff member in question reminded Mr. Bell that he should not file frivolous informal resolution requests.  Id. at ¶ 7.  On other occasions, Mr. Bell asserts staff members either tried to dissuade him from filing grievances or told him to stop filing grievances.  Docket 112, ¶¶ 8-13.  While the prison staff interpret these instances and attempts to resolve Mr. Bell's grievances at the lowest possible level,  Mr. Bell interprets them as attempts to intimidate him or prevent him from filing grievances at all.  Docket Nos. 109-1 through 109-8.

Another incident which Mr. Bell interprets as retaliation against him by staff is the aftermath of an altercation which occurred between Mr. Bell and inmate Gerald Dismounts Thrice.  According to prison staff, verbal exchanges and arguments between inmates are commonplace and do not usually escalate to physical altercations.  Flick affidavit, Docket 114, ¶ 6.  On the date in question (February 1, 2017), Mr. Bell and Mr. Dismounts Thrice engaged in a physical altercation.  Senior Correctional Officer Randy Flick (not a party to this lawsuit) observed Mr. Bell and Mr. Dismounts Thrice "having words" in the "chow line" on that date.  Id. at ¶ 4.  The prison personnel on the scene were not previously aware of any problems between Mr. Bell and Mr. Dismounts Thrice.  Id. at ¶ 7.  Mr. Bell initiated the physical altercation between the two men, and the prison staff ordered them to stop.  Id. ¶ 9.  When Mr. Bell and Mr. Dismounts Thrice did not stop fighting, SCO Arop ran into the dining hall and brought inmate Dismounts Thrice to the ground to stop the altercation.

Id. at ¶ 10. The altercation lasted only a few seconds. Id. at ¶ 11. Both inmates were charged with disciplinary write-ups and moved to the Special Housing Unit (SHU) as a result of the incident. Id. at ¶ 12.

Pursuant to policy, Mr. Bell was placed in a holding cell in the SHU and provided with a security gown. Arop affidavit (Docket 115) at ¶ 9. Mr. Bell refused to wear the security gown he was provided. Id. at ¶ 10. SCO Arop asked Mr. Bell to wear the security gown so the nurse could check on him, but Mr. Bell repeatedly refused. Id. at ¶ 11-14. As a result of his refusal to wear the security gown, Mr. Bell was charged with two more disciplinary write-ups for conduct which disrupts or interferes with the security or good order of the institution or interfering with a staff member in the performance of his or her duty and with having unsolicited contact or making suggestive remarks or gestures. Id. at ¶¶ 15-16.

Mr. Bell was seen by nursing staff, assessed, and though he had sustained facial injuries, the bleeding had stopped and Mr. Bell denied he had lost consciousness, that he felt nauseous, or that he had vomited. Smythe affidavit (Docket 110), ¶ 6. His pupils were unequal but reactive to light and his neurological signs were otherwise normal. Id. at ¶ 7. Nursing staff received medical orders over the phone to observe Mr. Bell for 4 hours. Id. ¶ 11. Mr. Bell was instructed to alert the nursing staff to any changes in his condition before he was released from Health Services. Id. at ¶ 12.

### 4. Count 4: Equal Protection Claim

Mr. Bell notes that though the text of OM 2.3.C.4 has not changed, the defendants have changed how that policy has been applied. Mousel deposition at p. 29-30. Mr. Bell also asserts the defendants' statements about how they determine whether a publication is acceptable pursuant to OM 2.3.C.4 are contradictory. Compare response to interrogatory (Docket 126-2 at p. 8) to Mousel deposition at p. 24. Mr. Bell argues that though the defendants claim the policy is facially neutral (Mousel affidavit, Docket 57, ¶ 21), the people who actually apply the policy consider both the content of the book and the identity of the party who sent it in making the determination regarding whether the inmate will be allowed to receive the book. Mousel deposition at p. 34.

The allegations in the amended complaint regarding the Equal Protection claim mirror those which are recited in the retaliation claim. In other words, in support of his class of one Equal Protection claim, Mr. Bell alleges he was treated in a disparate manner when the defendants (1) decided to reject Mr. Bell's books and magazines (the court therefore concludes this equal protection claim is made against defendants Mousel and Moisan); (2) decided to place him in a holding cell at the JPA with only a security gown to wear after the February 1, 2017, "chow hall" fight—the court therefore understands this claim to be made against CO Arop and Major Benting, who are not parties to this lawsuit; (3) were deliberately indifferent to his medical needs after the February 1, 2017, "chow hall" fight—the court understands this claim to be made against LPN April Smythe, who is not a party to this lawsuit; (4) failed to

provide him with grievance forms "kites" when requested by him—the court therefore understands this claim to be made against UC Steinecky, who is not a party to this lawsuit; and (5) Mr. Bell further asserts that to the extent any defendant was not personally involved in these decisions, such defendant is nonetheless liable because he or she knew about the wrong and failed to intercede because he or she failed to oversee the agents or representatives who engaged in the wrongful conduct, or created a policy or custom that permitted the conduct to occur. The court understands this claim to be one for supervisory liability as against Warden Young, Deputy Warden Dreiske, and Secretary of Corrections Kaemingk.

Because these are the same claims that are articulated in count three of the amended complaint, the court incorporates the same factual allegations as are stated in support of that claim as having been made in support of Mr. Bell's class of one Equal Protection.

## DISCUSSION

### A.    Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party. See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (citing United States v.

Diebold, Inc., 369 U.S. 654, 655 (1962)); Helton v. Southland Racing Corp.,

600 F.3d 954, 957 (8th Cir. 2010) (per curiam).  Summary judgment will not lie

if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986); Allison v. Flexway Trucking, Inc., 28 F.3d 64, 66 (8th Cir. 1994).

The burden is placed on the moving party to establish both the absence

of any genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law.  FED. R. CIV. P. 56(a).  Once the movant has met

its burden, the nonmoving party may not simply rest on the allegations in the

pleadings, but must set forth specific facts, by affidavit or other evidence,

showing that a genuine issue of material fact exists.  Anderson, 477 U.S. at

256; FED. R. CIV. P. 56(e) (each party must properly support its own assertions

of fact and properly address the opposing party's assertions of fact, as required

by Rule 56(c)).

The underlying substantive law identifies which facts are "material" for

purposes of a motion for summary judgment.  Anderson, 477 U.S. at 248.

"Only disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment.  Factual

disputes that are irrelevant or unnecessary will not be counted."  Id. (citing 10A

Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Fed. Practice &

Procedure, § 2725, at 93–95 (3d ed. 1983)).  "[T]he mere existence of *some*

alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247–48.

Essentially, the availability of summary judgment turns on whether a proper jury question is presented: "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.

The failure by an opposing party to properly resist summary judgment "does not automatically compel resolution of [the motion] in favor of" the movant. United States v. One Parcel of Real Property, 27 F.3d 327, 329 n.1 (8th Cir. 1994); Canada v. Union Elec. Co., 135 F.3d 1211, 1213 (8th Cir. 1997). Federal Rule of Civil Procedure 56(e) allows for the possibility that a party may fail to resist another party's assertion of fact. When this happens, the court must still make a determination as to whether the moving party is entitled to judgment in his favor on the merits. One Parcel of Real Property, 27 F.3d at 329 n.1. See also Fed. R. Civ. P. 56(e)(3) (upon a party's failure to contest facts asserted by the movant, the district court may grant summary judgment *if* the facts and the law show that the movant is entitled to judgment in his favor).

## B.    Qualified Immunity

Defendants assert that they are entitled to qualified immunity and, therefore, the court should enter summary judgment in their favor.  In

addition, they argue that Mr. Bell cannot make out a constitutional violation, also entitling them to summary judgment.

In order to show a *prima facie* case under 42 U.S.C. § 1983, Mr. Bell must show (1) defendants acted under color or state law and (2) " 'the alleged wrongful conduct deprived him of a constitutionally protected federal right.' " Zutz v. Nelson, 601 F.3d 842, 848 (8th Cir. 2010) (quoting Schmidt v. City of Bella Villa, 557 F.3d 564, 571 (8th Cir. 2009)).

Qualified immunity protects government officials from liability and from having to defend themselves in a civil suit if the conduct of the officials "does not violate clearly established statutory or constitutional rights." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity is immunity from suit, not just a defense to liability at trial. Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). Therefore, the Supreme Court has "repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 236 (1991).

To determine whether an official may partake of qualified immunity, two factors must be determined: (1) whether the facts that plaintiff has shown make out a violation of a constitutional right and (2) whether that constitutional right was "clearly established" at the time of the official's acts. Saucier v. Katz, 533 U.S. 194, 201 (2001). If the court finds that one of the two elements is not met, the court need not decide the other element, and the court may address the elements in any order it wishes "in light of the circumstances of the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009).

Defendants are entitled to qualified immunity if the answer to either of the Saucier prongs is "no."

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.' " Stanton v. Sims, 571 U.S. 3, 6 (2013) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 743, (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986))).  " 'We do not require a case directly on point' before concluding that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.' " Stanton, 571 U.S. at 6.  " 'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.' " Ambrose v. Young, 474 F.3d 1070, 1077 (8th Cir. 2007) (quoting Hunter, 502 U.S. at 229).

The Supreme Court has stated that "if the defendant does plead the [qualified] immunity defense, the district court should resolve that threshold question before permitting discovery." Crawford-El v. Britton, 523 U.S. 574, 598 (1998) (citing Harlow, 457 U.S. at 818).  Only if the plaintiff's claims survive a dispositive motion on the issue of qualified immunity will the plaintiff "be entitled to some discovery." Id.  Even then, the Court has pointed out that FED. R. CIV. P. 26 "vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." Id.  Such discretion includes the ability to establish limits on the number of depositions and interrogatories, to limit the length of depositions, to limit the number of

requests to admit, to bar discovery on certain subjects, and to limit the time, place, and manner of discovery as well as its timing and sequence.  Id.  In this case, the district court appointed counsel for Mr. Bell and allowed limited discovery for the purpose of determining whether the defendants are entitled to qualified immunity.

The qualified immunity defense applies only to the individual capacity claims against defendants for money damages; it does not affect plaintiff's official capacity claims for declaratory and injunctive relief.  Pearson, 555 U.S. at 242-43; Hafer v. Melo, 502 U.S. 21, 25 (1991); Grantham v. Trickey, 21 F.3d 289, 295 (8th Cir. 1994).  If, however, the plaintiff has failed to establish the violation of his constitutional or statutory rights by the named defendants, "[t]his conclusion necessarily resolves the merits of [plaintiff's] claims for equitable relief as well."  Cox v. Sugg, 484 F.3d 1062,  1068 (8th Cir. 2007).  As such, even if equitable relief against defendants in their official capacities were theoretically possible, such relief could not be afforded if plaintiff's claims of constitutional and statutory violations fail on their merits.

## C.    Supervisory Liability

"In the section 1983 context, supervisor liability is limited.  A supervisor cannot be held liable, on a theory of respondeat superior, for an employee's unconstitutional actions."  White v. Holmes, 21 F.3d 277, 280 (8th Cir. 1994).  Rather, a supervisor incurs liability for an Eighth Amendment violation when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate indifference toward the violation.

32

Choate v. Lockhart, 7 F.3d 1370, 1376 (8th Cir. 1993). "The supervisor must know about the conduct, and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he or she] might see." Ripson v. Alles, 21 F.3d 805, 809 (8th Cir. 1994) (citations omitted).

Further,

> [b]ecause vicarious liability is inapplicable to § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution. Ashcroft v. Iqbal, 556 U.S. 662 (2009). Thus, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct. As we have held, a supervising officer can be liable only if he directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation.

Parrish v. Ball, 594 F.3d 993, 1001 (8th Cir. 2010) (citation omitted, internal punctuation altered).

"Failure to process or investigate grievances, *without more*, is not actionable under § 1983." Thomas v. Banks, 584 Fed. Appx. 291 (8th Cir. 2014) (emphasis added); Harris v. Caruso, 465 Fed. Appx. 481, 487 (6th Cir. 2012). Thomas does not foreclose the possibility that a supervisor's involvement by virtue of responding to a grievance, in addition to other facts, might subject him or her to liability in an individual capacity.

**D.      The Scope of Claims Considered On Summary Judgment**

Before beginning the discussion of the merits of defendants' summary judgment motion, the court explains what will not be discussed in this opinion. In his brief in response to the defendants' summary judgment motion (Docket 125), Mr. Bell argues that OM 2.3.C.4  (the "book policy") and Policy 1.3.C.8

(the pornography policy), are facially invalid and invalid as applied to him because they violate the Establishment Clause of the First Amendment to the United States Constitution.[7] Mr. Bell asserts these policies elevate religious materials over secular materials.

The example Mr. Bell offers is the Bible. Mr. Bell asserts the Bible is routinely accepted into SDDOC facilities under both OM 2.3.C.4 (even when it is a donated book) and under Policy 1.3.C.8 (even though Mr. Bell cites written passages from the Bible which he asserts meet the definition of "sexually explicit") and are therefore in technical violation of Policy 1.3.C.8. But Mr. Bell did not raise an Establishment Clause claim in his amended complaint.

"The liberal pleading standard under Federal Rule of Civil Procedure 8(a) does not afford a plaintiff with an opportunity to raise new claims at the summary judgment stage." Wireco Worldgroup v. Liberty Mutual Ins. 231 F. Supp. 3d 313, 318 (W.D. Mo. 2017). A plaintiff may not amend his complaint through an argument in a brief opposing summary judgment. Id. (citing Gilmore v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004); Northern States Power & Co. v. Fed. Transit Admin., 358 F.3d 1050, 1057 (8th Cir. 2004). See also, Satcher v. Univ. of Arkansas at Pine Bluff Bd. of Trustees, 558 F.3d 731, 735 (8th Cir. 2009) (plaintiff not allowed to "expand" his claims in a summary judgment brief, having not raised them in his complaint). The defendants have moved for summary judgment based on their claim of

_____

[7] The First Amendment states in relevant part: ""Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof..."

entitlement to qualified immunity.  Because Mr. Bell did not plead the Establishment Clause claim in his amended complaint, whether the defendants' policies violate the Establishment Clause plays no part in this court's determination of the defendants' motion.

**E.    First Amendment Free Speech Claims:**

Counts I and II of Mr. Bell's amended complaint are First Amendment claims in which he asserts the South Dakota DOC policies at issue (1) are facially invalid; and (2) are unconstitutional as they have been applied to him. Courts have struggled over the decades with how to apply the First Amendment's guaranty of freedom of speech in the context of prison life.  The court discusses three important United States Supreme Court decisions and other pertinent authority below as the foundation for the court's evaluation of the issues presented in this case.

Under Procunier v. Martinez, 416 U.S. 396 (1974), the Court held a prison regulation of mail between inmates and non-inmates was required to "further an important or substantial governmental interest unrelated to the suppression of expression" in order to satisfy Constitutional mandates. Martinez, 416 U.S. at 413-14.  The means used to further this governmental interest must be "no greater than is necessary or essential to the protection of the particular governmental interest involved."  Id.  In addition, prison officials were required to notify the inmate and the non-inmate if they rejected a letter. Id. at 418.  The prison regulation at issue in Martinez allowed censorship of letters that "unduly complain," "magnify grievances," or "express inflammatory

political, racial, or religious or other views or beliefs." Id. at 399. The regulation allowed censorship of both outgoing and incoming mail. Id. at 416. As with other areas of the law dealing with prison administration and prisoners' rights, however, the pendulum began to swing in the other direction after Martinez.[8]

In Turner v. Safley, 482 U.S. 78, 81-82 (1987), inmates challenged prison regulations which restricted correspondence between inmates at different state prisons. Correspondence between inmates who were immediate family members was allowed, as was correspondence about legal matters. Id. at 81. However, other correspondence could be prohibited if deemed in the best interests of the parties involved. Id. at 82. In practice, all inmate correspondence between inmates at different prisons was prohibited if it was not between immediate family members. Id.

The Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Id. at 89. The Court rejected the earlier standard applied in Martinez. Id. at 83. The reasonable relation test was more appropriate, according to the Turner Court, because separation of powers counseled that the administration of prisons was largely a function of the legislative and executive branches of government. Id. at 85. Also, an added

---

[8] See e.g. Wolff v. McDonnell, 418 U.S. 539, 563-65 (1974) (holding due process protections applied to all prison disciplinary procedures), with Sandin v. Conner, 515 U.S. 472, 483-84 (1995) (holding 21 years later that the due process analysis did not apply to prison discipline unless the discipline imposed "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life").

degree of deference applied when a federal court was reviewing a state penal system.  Id.  "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources," the Court wrote.  Id. at 84-85.  Also, "the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree."  Id. at 84.

The Turner reasonable relation standard requires the court to evaluate four factors: (1) whether the governmental objective underlying the regulations is  legitimate and neutral, and whether the regulations is rationally related to that governmental objective; (2)whether there are alternative means of exercising the right that remain open to prisoners; (3)what impact the accommodation of the plaintiff's asserted constitutional right will have on others (guards and inmates) inside the prison; and (4)whether there are obvious, easy alternatives whose existence show that the regulation in question is not reasonable, but is an "exaggerated response" to prison concerns.
Id. at 89-91.

The Court upheld the policy barring inmate-to-inmate correspondence.
Id. at 91.  The court accepted defendants' articulation of the need for the ban to prevent communication about escape plans, assaults, and other violent acts, especially with regard to prison gangs living at different institutions.  Id.  Also, the prison in question was used for protective custody and this use would have been vitiated if correspondence was allowed that leaked information about inmates in protective custody at the facility.  Id.  The Court also found

defendants' objectives were neutral and reasonably related to the ban.  Id. at 91-92.

As to the second factor, the Court noted that inmates' right to freedom of speech was not completely deprived by the ban—that right was only infringed as to "a limited class of other people with whom prison officials have particular cause to be concerned"—i.e. inmates at other prisons.  Id.  The third factor also favored the defendants because core functions of prison administration, safety and internal security would be impacted, leading to less security and less liberty for everyone else, both guards and inmates.  Id. at 92.

As to the fourth factor, no easy alternatives to the policy were apparent.  Id. at 93.  Other similarly-situated prisons had adopted similar policies.  Id.  And monitoring the content of inmates' correspondence would impose a great burden on prison officials, and could be evaded by the use of jargon or code in letters.[9]  Id.  The burden of establishing the existence of easy obvious alternatives is on the inmate, not the prison.  See O'Lone v. Estate of Shabazz, 482 U.S. 342, 350 (1987).

The Turner factors were applied two years later in Thornburgh v. Abbott, 490 U.S. 401 (1989).  At issue in Thornburg was a federal Bureau of Prisons

---

[9] The Turner Court also decided whether a ban on inmate marriages was valid.  That portion of the Turner decision—not applicable here-- was legislatively impacted by the passage of the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc, et seq.  After RLUIPA, constitutional claims premised on the First Amendment free exercise of religion clause continue to be governed by the Turner standard, however claimants can now bring a claim under RLUIPA, which imposes a stricter standard on prison regulations affecting religion.  See Gladson v. Iowa Dept. of Corrections, 551 F.3d 825, 831-32 (8th Cir. 2009).

(BOP) regulation that allowed the prison warden to reject outside publications mailed to a prisoner if the publication was deemed to be detrimental to the "security, good order, or discipline of the institution or if it might facilitate criminal activity." Id. at 403 n.1. The regulations forbid the rejection of a publication "solely because its content is religious, philosophical, political, social or sexual, or because its content is unpopular or repugnant." Id. at 405.

Publications could not be black-listed categorically under the regulation; rather, each issue had to be reviewed separately. Id. Staff of the warden could screen and approve publications, but only the warden could reject a publication. Id. at 406. If the warden rejected a publication, he was required to immediately notify the inmate in writing of the rejection and the reasons therefor, including a reference to the specific part of the publication deemed objectionable. Id. The sender could obtain review of such a decision by the regional director of the BOP; the inmate could submit a grievance of the issue through the prison administrative remedy process. Id. The inmate could review the rejected publication unless allowing such review would "provide the inmate with information of a nature which is deemed to pose a threat or detriment to the security, good order or discipline of the institution or to encourage or instruct in criminal activity." Id.

A program statement was published providing guidance on sexually explicit material. Id. Explicit heterosexual material was ordinarily admissible at BOP facilities. Id. at 405 n.6. Homosexual, sado-masochistic, bestiality, and sexually explicit materials involving children were generally banned. Id.

Other explicit material was admissible if it had scholarly, general social, or literary value.  <u>Id.</u>  Homosexual material that was not sexually explicit was admissible, such as publications covering the activities of gay-rights groups or gay religious groups, and literary publications with homosexual themes or references were admissible.  <u>Id.</u>

The <u>Thornburgh</u> Court held First Amendment concerns were implicated—both for the inmates and for the persons sending mail to the inmates—by prison officials' interference with inmates' incoming mail, but that such rights "must be exercised with due regard for the 'inordinately difficult undertaking' that is modern prison administration."  <u>Id.</u> at 407 (quoting <u>Turner</u>, 482 U.S. at 85).  The Court noted many people on the "outside" have an interest in access to those on the "inside" of prisons, but certain such interactions, though "seemingly innocuous to laymen," may pose "potentially significant implications for the order and security of the prison."  <u>Id.</u>  Noting the judiciary was "ill equipped" to administer the "difficult and delicate problems of prison management," the Court held "considerable deference" would be afforded the regulations of prison administrators.  <u>Id.</u> at 407-08.

In adopting its standard of reasonable relation to legitimate penological interests, the Court rejected the <u>Martinez</u> standard which required the state to show that the regulation furthered an important or substantial governmental interest in the least restrictive way.  <u>Id.</u> at 408-09.  The Court held the <u>Martinez</u> standard did not accord "sufficient sensitivity to the need for discretion in meeting legitimate prison needs."  <u>Id.</u> at 410.  In doing so, the <u>Thornburgh</u>

Court suggested that a key difference distinguishing the holding in Martinez from the holding in Thornburgh was that the Martinez prison policy affected incoming *as well as outgoing* prisoner mail.  Id. at 411-12.  Outgoing mail addressed to non-prisoners "cannot reasonably be expected to present a danger to the community *inside* the prison" the Court stated.  Id. at 411-12, and 410 n.10.    The Court concluded the Turner standard applied in Thornburgh while the Martinez standard applied to regulations concerning outgoing correspondence.  Id. at 413.

Applying the Turner factors to the regulation, the Thornburgh Court held the prison mail policy was undergird by a legitimate and neutral objective, and that the regulation bore a rational relation to that objective.  Id. at 414.  In discussing this first factor, the Court acknowledged that "neutrality" under Turner was not the traditional notion of content-neutral laws usually discussed in First Amendment jurisprudence.  Id. at 415.  Rather, Turner neutrality requires that "the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression."  Id. (quoting Martinez, 416 U.S. at 413).  Where the prison regulation at issue distinguishes based on content solely because of the "potential implications for prison security, the regulations are 'neutral' in the technical sense in which we meant and used that term in Turner."  Id. at 415-16.  A rational relationship existed between the prison's neutral goal and the means used to enforce that goal—especially because the duty to reject a publication was a non-delegable duty of the warden's and because publications

could not be categorically banned.  Id. at 416-17.  Thus, there would not be "shortcuts that would lead to needless exclusions."  Id. at 417.

The second Turner factor—alternative means of exercising the right—also favored the BOP regulation.  Id. at 417-18.  In this regard, the Court noted that the "right" at issue was to be defined "sensibly and expansively."  Id. at 417.  Thus, the right at issue in Turner was not the right to communicate with inmates at other institutions (a very narrow definition), but rather the right to exercise other means of expression.  Id. at 417-18.  Likewise, in a case involving participation in a Jumu'ah religious ceremony, the right was defined as participation in Muslim religious ceremonies, not participation in the exact ceremony at issue, a Jumu'ah.  Id. at 418 (discussing O'Lone, 482 U.S. at 351-52).  Here, prisoners remained free to send and receive other forms of mail and publications.  Id.

The Thornburgh Court also held the third Turner factor—impact that accommodation of the right would have on others—to be satisfied.  Id.  Like the situation in Turner, the Court held that the restricted publications could only be allowed to circulate in the prison at great cost to the safety and liberty of other prisoners and guards.  Id.

Finally, the fourth Turner factor—existence of obvious, easy alternatives to the regulation—also favored the BOP regulation.  Id.  The plaintiffs in the suit argued that the warden could just tear out offending pages of publications and give the remaining publication to inmates; that the warden's all-or-nothing rejection of publications was an exaggerated response to the threat.  Id. at 418-

19.  Prison officials responded that testimony in the record supported the conclusion that tearing out portions of publications would create more discontent among inmates than the current practice.  Id.  The court held where prison officials' fears about an alternative practice are reasonably founded, the alternative is not a viable alternative.  Id. at 419.

In Herlein v. Higgins, 172 F.3d 1089 (8th Cir. 1999), the plaintiff prisoner challenged on First Amendment grounds a prison regulation which banned the possession of music cassettes bearing warning labels which indicated the music contained "explicit" lyrics.  Id. at 1090.  The court reiterated that to survive constitutional scrutiny, the regulation must bear a valid, rational connection to a legitimate penological interest.  Id.  It reiterated that in Turner the Supreme Court explained "the connection between a prison regulation and a government interest is inadequate when 'the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational.' " Id. at 1091 (citing Turner, 482 U.S. at 89-90).  Mr. Herlein argued the policy was overbroad because the prison officials had presented no evidence that the explicit music tapes had caused any security difficulties within the prison prior to the ban.  Id. at 1091.  The court rejected this argument,  explaining "there is nothing in our cases, though, that requires actual proof that a legitimate interest will be furthered by the challenged policy. The connection between the two need only be objectively rational." Id.  The court did not believe it was arbitrary or irrational to believe that music with violent or sexually explicit lyrics might present a security risk in an

environment that included gangs and sex offenders.  Id.  It ultimately upheld the validity of the prison's policy.  Id. at 1092.

"A facially valid regulation 'may be invalid if it is applied to the particular items in a way that negates the [prison's] legitimate concerns.' "  Murchison v. Rogers, 779 F.3d 882, 887 (8th Cir. 2015).  In Murchison, the prison inmate did not challenge on its face the prison regulation which banned incoming publications that promoted violence, but rather he challenged the application of the regulation to the prison officials' decision to prohibit his receipt of a particular issue of *Newsweek* magazine.  Id.  In an "as applied" challenge, the court should consider whether the ban on the particular item in question is reasonably related to a legitimate penological objective.  Id. (citing Williams v. Brimeyer, 116 F.3d 351, 354 (8th Cir. 1997).  But, prison authorities have broad discretion to restrict a prison inmate's receipt of a publication to serve a legitimate penological interest, including prison security.  Id. (citing Ivey v. Ashcroft, 62 F.3d 1421 (8th Cir. 1995) (unpublished)).  However, summary judgment is appropriate only if prison officials present some specific evidence of why a particular item implicates prison concerns.  Id. at 888 (citing Murphy v. Missouri Dept. of Corrections, 372 F.3d 979, 986 (8th Cir. 2004)).

The Murphy case involved a prison inmate incarcerated in Missouri. Murphy, 372 F.3d at 981.  Mr. Murphy brought several claims against prison officials, including a claim asserting the Missouri Department of Corrections' (MDOC's) mail censorship policy violated his First Amendment right to receive mail.  Id. at p. 985-86.  At issue in Murphy was the prison's denial of a

particular piece of mail (Issue 36 of a religious publication entitled *The Way*, which was apparently published by his preferred religious group the Christian Separatist Society—a white supremacist group). The issue of *The Way* was rejected by mailroom personnel because it was "so racially inflammatory as to be reasonably likely to cause violence." Id. at 986.

The Eighth Circuit began its analysis of this claim by acknowledging that regulations involving incoming prison mail need only be reasonably related to legitimate penological interests. Id. at p. 985 (citing Thornburgh, 490 U.S. at 413-14). And that a regulation that allows for censorship of incoming items that are likely to incite violence is related to the institutional need of maintaining a controlled an secure environment within the prison. Id. at 986 (citing Ortiz v. Fort Dodge Corr. Facility, 368 F.3d 1024, 1026-27 (8th Cir. 2004)).

The Murphy court continued, however, by concluding that summary judgment in favor of the defendants was not appropriate because material issues of fact remained. Id. Though it concluded the policy itself was reasonably related to legitimate penological interests, the court was not persuaded that the defendants' decision to reject Issue 36 of *The Way* satisfied the Turner factors. Id. The court's independent review of Issue 36 of *The Way* did not indicate it encouraged violence and "MDOC's documented reason for censoring the item is too conclusory to support a judgment in its favor on this issue." Id. The court reiterated its deference to prison officials, but stressed summary judgment was nevertheless appropriate only if prison officials

45

supported their motion with some specific evidence of why this particular item implicates prison concerns.  Id.

In Sisney v. Kaemingk, 886 F.3d 692 (8th Cir. 2018), a case originating in this court, the Eighth Circuit acknowledged an inmate's right to bring both facial and as-applied First Amendment challenges to prison regulations.  Id. at 697.  "In the First Amendment context, we recognize a unique species of facial challenge, 'under which a law may be overturned as impermissibly overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.' " Id. (citing Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 449 n. 6 (2008)).  The court instructed that "the lawfulness of the particular application of the [regulation] should ordinarily be decided first."  Id. at 698 (citing Board of Trustees of State Univ. of N.Y. v. Fox, 492  U.S. 469, 485 (1989)).  This is because a facial challenge is ordinarily a much more difficult undertaking.  It requires a determination of whether the statute's overreach is substantial as an absolute matter and it is judged in relation to the statute's plainly legitimate sweep.  Thus, the inquiry into the validity of the regulation requires consideration of more applications than those which are immediately before the court.  Id. at 698.  The court also noted that if entitled to relief under the as-applied analysis, the prisoner plaintiff's claims "might be redressed without reaching the overbreadth issue."  Id.  (citing Jacobsen v. Howard, 109 F.3d 1268, 1274-75 (8th Cir. 1997)).

1. **OM 2.3.C.4 (Count One—Defendants Mousel, Dreiske and Young)**

The defendants allege that OM 2.3.C.4 is necessary for the safety and security of the institution.  The court understands Mr. Bell's first cause of action to be based upon his claim that defendants' rejection of two books sent to him from Bound Together Bookstore and two books sent to him from Parallax Press is not rationally related to their claimed legitimate penological interest of institutional safety and security.   The court agrees with Mr. Bell.

The two books from Bound Together Bookstore were entitled "Past Lives" and "Mainstream of Civilization."  The titles of the two books from Parallax Press[10] are unknown.  The defendants rejected these books because they were

---

[10] Parallax Press is a non-profit publisher that distributes free books to incarcerated individuals.  The information below is copied directly from Parallax Press's website:

**Our Mission**
Parallax Press is a nonprofit publisher founded by Zen Master Thich Nhat Hanh. We publish books and media on the art of mindful living and Engaged Buddhism. We are committed to offering teachings that help transform suffering and injustice. Our aspiration is to contribute to collective insight and awakening, bringing about a more joyful, healthy, and compassionate society.

We're grateful for our readers, wherever they find our books—at local bookstores, libraries, stores of all shapes and sizes, or received as a gift.

For every book you buy from directly from us (on this site, or in person), we donate one to a person who is incarcerated. Your purchase is a gift that sustains our work and offers refuge to someone who needs it most.

**Our Values**
These are the values that guide our internal business operations and measures of success. We strive to practice what we publish and be a model for workplaces everywhere.
1.We grow sustainably and with integrity.
2.We practice skillful compassionate communication.

donated and therefore deemed to be "used" rather than "new" under OM

2.3.C.4.  The defendants do not claim these books violated any other DOC

policy or guideline (i.e. the defendants do not claim these books were sexually

explicit, contained nudity, or were otherwise in violation of Policy 1.3.C.8).

Mr. Bell avers all of these books were new rather than used, and there is

no evidence to the contrary in the record.  Mr. Bell avers that in the past, he

had received donated books from these two sources without incident.

As explained above, Mr. Bell has raised both a facial challenge and an

as-applied challenge to OM 2.3.C.4.  On its face, this policy forbids South

Dakota DOC inmates from receiving books from outside the institution unless

---

3. We commit to social justice in action.
4. We choose creativity over safety and excellence over expediency.

**Our Story**
Parallax was founded in 1986, with the publication of Thich Nhat Hanh's book Being Peace. We have over 125 active titles in print, and our bestselling books have sold over 100,000 copies. Our books are available in 35 languages and in countries around the world. Parallax's mission is to publish beautiful, well-crafted books that nourish happiness and show the connection between the inner and outer work for peace and justice.

**Our Founder**
Thich Nhat Hanh founded the Unified Buddhist Church (Église Bouddhique Unifiée) in 1969 during the war in Vietnam. The Unified Buddhist Church established its first practice community in the West in 1975 in France during Thich Nhat Hahn's exile from Vietnam. Today, there are retreat centers and mindfulness practice centers around the world where visitors can come learn the art of mindful living.

**Our Commitment**
As a nonprofit publisher, we are committed to modeling a more sustainable and humane way of doing business. We offer free books for people who are incarcerated. We also structure in daily meditation and mindfulness practices as part of the working day.

See http://www.parallax.org/about/ (last checked June 27, 2018).

the books are new, are "purchased" and unless the books are received from a

centralized retailer, warehouse, distributor, dealership, or publisher. The

named defendant (CO Mousel) who actually implements the policy, however,

explained he has never implemented OM 2.3.C.4 as written—ever.

Instead, here is how the policy is actually implemented: donated books

are allowed, but only if those books are (1) new and; (2) originate from a

religious source. If the books are not from a religious source, they must still

be new, but they cannot be donated. Instead, the books must be purchased

from a centralized retailer, warehouse, distributor, dealership, or publisher. If

they are not from a religious source and are donated, they are automatically

deemed "used" even if they are new, and are therefore rejected pursuant to OM

2.3.C.4. This is what happened to Mr. Bell's books from Parallax Press and

Bound Together Bookstore.[11]

Pursuant to the directive in Sisney, the court will address Mr. Bell's as-

applied challenge first. The dilemma for this court is, "against which policy

should the defendants' conduct be measured—OM 2.3.C.4 as it is written or

the informal policy that it is regularly applied in place of OM 2.3.C.4?" For the

reasons explained below, measured by either yardstick, the defendants'

---

[11] This is subject to Warden Young's explanation, which completely contradicts
defendant Mousel's deposition testimony. Warden Young's interrogatory
answers indicate that new donated books, regardless of the source, cannot be
given to individual inmates, but can be placed in the institution's library or
chapel. There is no evidence in this case, however, that Mr. Bell's books from
Parallax Press or Bound Together Bookstore were placed in the library or
chapel.

conduct in denying the books from Bound Together Books and Parallax Press was unconstitutional.

In Payne v. Britten, 749 F.3d 697 (8th Cir. 2014), the court instructed lower courts how to conduct the inquiry when a First Amendment as-applied question is presented and the defendants move for summary judgment based upon a claim of qualified immunity. "[A]ny analysis of the merits of a qualified immunity defense will require the district court to assess whether the regulation or policy at issue under which the mail is being held is valid and neutral and whether it addresses a legitimate penological concern." Id. at 701-02. Further, "[a] qualified immunity analysis will then require the district court to conduct an independent review of the evidence to determine if the officials have demonstrated an exaggerated response to those penological concerns in relation to a particular item of mail that has been confiscated." Id. at 702. If a valid regulation is applied to a particular piece of mail in a way that negates the legitimate penological interest, the regulation may be unconstitutional as applied to those items. Id. (citing Kaden v. Slykhuis, 651 F.3d 966, 969 (8th Cir. 2011).

The Turner analysis applies equally to facial and as-applied First Amendment challenges. See Bahrampour v. Lampert, 356 F.3d 969, 975 (9th Cir. 2004). However, "because the Turner factors were developed in the context of facial constitutional challenges, they may or may not lend themselves to an 'as-applied' analysis, depending on the facts and circumstances of any given case. Accordingly, the court will address only those factors most applicable

and helpful to its analysis." <u>Lyon v. Grossheim</u>, 803 F. Supp. 1538, 1552 (S.D. Iowa 1992) (citing <u>Skelton v. Pri-Cor, Inc.</u>, 963 F.2d 100, 103 (6th Cir. 1991)). When resolving an as-applied challenge, the question for the court is whether the ban on the particular item was reasonably related to the legitimate penological objectives put forth for the policy as articulated by the prison officials. <u>Dean v. Bowersox</u>, 2013 WL 11322613 at *8 (W.D. Mo. Aug. 29, 2013) (citing <u>Williams v. Brimeyer</u>, 116 F.3d 351, 354 (8th Cir. 1997)). The duty of the court is to " 'make sure after an independent review that the regulation is not an exaggerated response to prison concerns.' " <u>Dean</u> at *8 (quoting <u>Lyon</u>, 803 F. Supp. at 1550 (quoting <u>Salaam v. Lockhart</u>, 905 F.2d 1168, 1171 (8th Cir. 1990)).

Turning now to the rejection of the books Mr. Bell ordered from Bound Together Bookstore and Parallax Press, the court evaluates the OM 2.3.C.4 as the defendants applied it to Mr. Bell. The evidence submitted in this case indicates the books from Bound Together Bookstore were new, soft cover, and were entitled "Past Lives" and "Mainstream of Civilization." The titles of the books from Parallax Press are unknown, but it is known that Parallax Press is a non-profit publisher that publishes books and media about Buddhism—and for each book purchased, Parallax donates one to an incarcerated person. <u>See</u> footnote 10.

The first <u>Turner</u> factor is whether the governmental objective underlying the regulation is legitimate and neutral, and whether the regulation is rationally related to that governmental objective. The objective articulated for

OM 2.3.C.4 is the safety and security of the South Dakota prison facilities. That objective is clearly legitimate and neutral. The second half of the inquiry is whether the regulation is rationally related to that governmental objective.

Here is where the analysis becomes difficult, because the policy which is actually applied by prison officials is different than the policy as it is written. The policy as it is written allows only new, purchased books which are mailed to the inmates directly from a centralized retailer, warehouse, distributor, dealership, or publisher. The policy as applied allows new books which are mailed to the inmate which are donated if they come from a religiously affiliated donor. The reason articulated by defendant Mousel for this distinction is that new books donated by non-religiously affiliated donors are more likely to contain contraband than new books donated by religiously affiliated donors. However, defendant Mousel conceded that often, it is impossible to tell if a book mailed to an inmate is purchased or donated, because it the book is often unaccompanied by any sort of receipt or invoice.

Similarly, none of the defendants have explained why a new book donated by a non-religiously affiliated centralized retailer, warehouse, distributor, dealership, or publisher is likely to contain contraband at all, let alone why it would be more likely to contain contraband than a new book donated from a religiously affiliated party.

Furthermore, the manner in which this un-written modification of OM 2.3.C.4 was applied to Mr. Bell by the rejection of the Parallax Press books was clearly an exaggerated response to the articulated prison concern (prison safety

and security).  This is so because Parallax Press **is** a religious[12] publisher, but the new books it donated to Mr. Bell were rejected nevertheless.   The duty of the court is to " 'make sure after an independent review that the regulation is not an exaggerated response to prison concerns.' " <u>Dean</u> at *8 (quoting <u>Lyon</u>, 803 F. Supp. at 1550 (quoting <u>Salaam</u>, 905 F.2d at 1171)).  When resolving an as-applied challenge, the question for the court is whether the ban on the particular item was reasonably related to the legitimate penological objectives put forth for the policy as articulated by the prison officials.  <u>Dean</u>, 2013 WL 11322613 at *8 (citing <u>Williams</u>, 116 F.3d at 354).

The new books which were donated to Mr. Bell from Bound Together Bookstore and Parallax Press were rejected for no other reason than they were deemed to be "used" under OM 2.3.C.4 and therefore a security threat, because prison officials did not perceive that they fell within the unofficial religious source donation exception.  This is because the prison officials did not perceive Bound Together Bookstore or Parallax Press to be religiously affiliated.  But the prison officials were mistaken—at least as to the Parallax Press books.  The fallacy of the religious affiliation vs. no religious affiliation relationship to

---

[12] As explained above, Parallax Press is affiliated with the Buddhist religion.  As explained above, though the defendants have articulated their theory that religiously affiliated entities are less likely to smuggle contraband than non-religiously affiliated entities, they not explained *why* they believe non-religiously affiliated retailers, warehouses, distributors, dealerships or publishers of new books are more likely to insert contraband into the new books they donate to prisoners.  The defendants have not even articulated a theory that, through their programs which provide free reading materials to prisoners, the publishers which donate *Buddhist* literature are more likely than those which donate *Christian* literature to smuggle contraband into South Dakota correctional institutions.

whether contraband might be smuggled within new, donated books is therefore laid bare. If prison officials cannot discern whether the source of a donated book is religiously affiliated or not, that distinction loses whatever miniscule legitimacy it ever had for purposes of drawing the line on accepting or rejecting a new, donated book based on the odds it might contain contraband. (And the court wishes to make clear that the prison officials presented absolutely zero justification for such a distinction in the first place).

The application of OM 2.3.C.4 to Mr. Bell's books received from Bound Together Books and Parallax Press was an extremely exaggerated response to a legitimate prison concern. The court can discern no legitimate penological objectives for the defendants' rejection of the new, donated books which were mailed to Mr. Bell from Bound Together Bookstore or Parallax Press.

The next <u>Turner</u> factor is whether there are alternative means of exercising the right that remain open to prisoners. <u>Murchison</u>, 779 F.3d at 892. Here, the defendants have explained there are plenty of books available to inmates on a variety of subjects in the prison library, so, they argue, Mr. Bell has not been deprived of his First Amendment right to free speech/freedom of expression by being deprived of access to reading materials, even if he was deprived of the specific books he wished to receive from Bound Together Bookstore and Parallax Press. The defendants also explain in their responses to requests for admissions that although donated new books cannot be sent directly to an individual prisoner, those same donated new books can be placed

in the prison library or the prison chapel for use by all of the prisoners.  <u>See</u>

response to request for admissions, Docket 126-2, p. 8.

The case law instructs that "[i]n evaluating this factor, 'courts should be

particularly conscious of the measure of judicial deference owed to corrections

officials in gauging the validity of the regulation.' " <u>Murchison</u>, 779 F.3d at 891

(citing <u>Turner</u>, 482 U.S. at 90).  "In considering this factor, 'the right in

question must be viewed sensibly and expansively.' " <u>Id.</u> (quoting <u>Thornburgh</u>,

490 U.S. at 417).  In <u>Murchison</u>, for example, the court explained the question

was not whether inmate Murchison had alternate ways to read the particular

issue of *Newsweek* magazine he wished to receive, but instead whether he had

other ways to educate himself about the issues contained within that issue of

*Newsweek* (the Mexican drug cartels and free press issues in Mexico, for

example).  Here, the court therefore interprets the appropriate inquiry to be

whether Mr. Bell had alternate avenues of reading about the Buddhist religion

available to him.  There is no evidence in the record to indicate whether the

particular new, donated books Mr. Bell ordered from Bound Together

Bookstore and/or Parallax Press were placed in the prison library or the Prison

chapel or whether there are reading materials about Buddhism in general

available to Mr. Bell in the prison library or in the prison chapel.  The court is

therefore unable to weigh this <u>Turner</u> factor in the analysis.

The third <u>Turner</u> factor is what impact the accommodation of the

plaintiff's asserted constitutional right will have on others (guards and inmates)

inside the prison.  Defendant Young explains that books sent in from "other

sources" have to be thoroughly inspected by prison staff, because it is not unusual for individuals or sources other than publishers, dealerships, or distributors to try to smuggle in contraband via the mail. Young affidavit, ¶¶ 11-12. This expenditure of time and energy, explains Warden Young, would be considerable and would place a "drastic" strain on the already limited resources which are available to the prison. Id. at ¶ 13. On the other hand, materials received directly from a publisher, retailer, or distributor typically only require a brief or cursory examination. Id. at ¶ 15. Books or publications from "other sources" require a "much more thorough/extensive inspection by staff." Id. This explanation by Warden Young does not make any distinction between donated or purchased books, or between whether the source of the books is a religiously affiliated publisher, retailer, or distributor.

As the court understands the defendants' explanation, no accommodation is necessary to allow Mr. Bell's receipt of new, donated books from Bound Together Bookstore or Parallax Press, so there would be no impact at all upon prison staff or other inmates. This is because there has been no evidence presented to this court that (1) the rejected books were anything other than new books; or (2) Bound Together Bookstore and Parallax Press did not fit OM 2.3.C.4's definition of a centralized retailer, warehouse, distributor, dealership, or publisher. And, as Warden Young has explained, donated rather than purchased books are already accepted into the institution—but they are placed into the library or chapel rather than given to the individual inmate. If the donated books are accepted into the institution for use by the entire inmate

56

population, they surely must be screened just as thoroughly as they would have been had they been accepted and given to the individual inmate. The court can therefore discern absolutely no impact upon prison staff if new, donated books which are received from centralized retailer, warehouse, distributor, dealership, or publishers are allowed to be given to individual inmates.

The fourth <u>Turner</u> factor is whether there are ready alternatives to the regulation at a *de minimis* cost. The absence of a ready alternative is evidence of the reasonableness of the prison regulation, while an alternative that fully accommodates the prisoner's right at *de minimis* cost to valid penological interests is evidence that the regulation does not satisfy the reasonable relationship standard. <u>Murchison</u>, 779 F.3d at 892 (citing <u>Turner</u>, 482 U.S. at 90-91). Here, the defendants have proved too much. If the very same new, donated books can be placed in the prison library or chapel for all inmates to view and read, why can't they be given to the inmate for whom they were intended in the first place? The defendants protest that inspecting each and every new, donated book would put a huge strain on their resources, but they have not explained how it costs more to inspect or screen a new donated book that will be given to an individual inmate for safety and security purposes rather than inspect or screen a new donated book that will be placed in the prison library or chapel—accessible to hundreds of inmates --for safety and security purposes. This factor also weighs in favor of finding that OM 2.3.C.4

was unconstitutionally applied to Mr. Bell in the denial of his new, donated books from Bound Together Bookstore and Parallax Press.

For the reasons explained above, this court finds OM 2.3.C.4 as it was applied to the books Mr. Bell was to have received from Bound Together Bookstore and Parallax Press violated Mr. Bell's First Amendment Right to receive mail. This is because as applied, the regulation did not bear a rational relationship to its stated purpose of institutional safety and security.

A finding that Mr. Bell's First Amendment right was violated, however, does not end the inquiry, because the defendants have moved for summary judgment based upon qualified immunity. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.' " Stanton, 571 U.S. at 5-6 (quoting al-Kidd, 563 U.S. at 743 (quoting Malley, 475 U.S. at 341)). " 'We do not require a case directly on point' before concluding that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.' " Stanton, 571 U.S. at 6. " 'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.' " Ambrose, 474 F.3d at 1077 (quoting Hunter, 502 U.S. at 229). The relevant question becomes what law was it that must have been clearly established?  Again, there need not be a factually identical case to put the defendants on notice. Stanton, 134 S. Ct. at 5.  But the law has long been clearly established that "when a prison regulation impinges on inmates' constitutional [First

Amendment] rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner, 482 U.S. at 89.

For many years, it has been beyond debate that a prison regulation must bear a reasonable relationship to the legitimate penological interest put forward to justify it. In this case, that standard was not met. Defendants Mousel and Young are therefore are not entitled to qualified immunity on this claim.

It appears, however, that defendant Dreiske's involvement in the denial of Mr. Bell's books from Parallax Press and Bound Together Bookstore amounted to nothing more than reviewing (in Warden Young's absence) one of the grievances submitted by Mr. Bell. See Docket 1-1, p. 52. "Failure to process or investigate grievances, *without more*, is not actionable under § 1983." Thomas, 584 Fed. Appx. 291 (emphasis added); Harris, 465 Fed. Appx. at 487. The court can find no other significant involvement by Deputy Warden Dreiske sufficient to impose § 1983 liability upon her.

Warden Young, however, is the signatory on Policy 2.3.C.4 (see, Docket 52-1, p. 16), and is the official who has offered the rationale that donated books are allowed in the prison library and chapel, but not allowed for individual inmates. Though Warden Young was not personally involved in the initial decision to deny Mr. Bell's receipt of the books from Parallax Press and Bound Together Bookstore, Warden Young's involvement rises to the level of "something more" required under Thomas and Harris. For these reasons, defendants Mousel and Young are not entitled to qualified immunity as to count one of Mr. Bell's amended complaint.

## 2.     Policy 1.3.C.8 (Count two—defendants Moisan and Young)

In count two of his amended complaint, Mr. Bell asserts defendants

Moisan and Young[13] violated his First Amendment right to free speech by

rejecting the May, 2016, issue of *Military History* magazine. The reason CO

Moisan rejected the magazine was because of the reproduction of a painting

contained within it on page 25 which depicted a bare-breasted woman. The

magazine was therefore rejected in its entirety pursuant to SDDOC Policy

1.3.C.8,[14] which prohibits, among other things, magazines that feature "nudity"

as that term is defined by the policy, within the SDSP.

### a.     First Amendment Law as to Pornography

Under the First Amendment a private citizen may not be criminally

prosecuted for mere possession of obscene material in the privacy of his own

home, although *distribution* of obscene material may be prohibited by the state.

Stanley v. Georgia, 394 U.S. 557, 568 (1969). Obscenity is not protected by the

First Amendment. Miller v. California, 413 U.S. 15, 23 (1973). However,

sexually explicit materials *are* protected by the First Amendment. Stanley, 394

U.S. at 568. See also Ashcroft v. Free Speech Coalition, 535 U.S. 234, 240

---

[13] Recall, defendant Moisan rejected the *Military History* magazine when it arrived in the mailroom and defendant Young affirmed this decision when Mr. Bell appealed it through the administrative remedy (grievance) process.

[14] Mr. Bell and defendants submitted two different versions of the DOC's pornography policy, 1.3.C.8. See, respectively, Docket No. 49-2 and 54-2. The policy submitted by Mr. Bell took effect 06/18/2016. See Docket 49-2. The policy submitted by defendants took effect 07/08/2015. See Docket No. 54-2. The major difference between the policies is the use of the term "inmate" versus "offender" and the description of DOC facilities covered by the policies. Neither of these changes affects Mr. Bell's lawsuit as he is an inmate/offender under either policy and the SDSP is a covered facility under both policies.

(2002) (holding the First Amendment generally protects non-obscene pornography for non-prisoners); Reno v. Amer. Civil Liberties Union, 521 U.S. 844, 875 (1997) (stating "In evaluating the free speech rights of adults, we have made it perfectly clear that sexual expression which is indecent but not obscene is protected by the First Amendment."). The allegation that obscene material may provoke the viewer to engage in antisocial behavior, or that indecent material may inappropriately fall into the hands of minors, is insufficient reason to justify a too-broad suppression of free speech. Reno, 521 U.S. at 875; Stanley, 394 U.S. at 566-67. Nor can mere possession of obscenity be criminalized as a necessary incident to enforcing laws prohibiting distribution of obscene materials. Stanley, 394 U.S. at 567. Were Mr. Bell a private, free citizen, he would undoubtedly have a right to possess pornographic material. Reno, 521 U.S. at 875.

However, "incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285 (1948), abrogated on other grounds by McCleskey v. Zant, 499 U.S. 467, 495 (1991). Courts have struggled over the decades with how to apply the First Amendment's guaranty of freedom of speech in the context of prison life. The court has already discussed in detail the Turner, Thornburgh and Martinez Supreme Court cases, and that discussion will not be repeated here. The possession of pornography in the prison setting, however, presents a special challenge. This is made clear by the number of times the SDDOC policy has

been challenged in federal court. The following is a summary of the history of cases which have been filed in this federal district court on the subject.

At the time the Carpenter v. South Dakota, 536 F.2d 759, 760 n.2 (8th Cir. 1976) was filed, the South Dakota Board of Charities and Corrections had a censorship policy that allowed them to censor any publication or portion thereof if it "presents a clear and present danger to security, order and rehabilitation." Id. at 760 n.2. If penitentiary officials censored material, they were required to give notice of the censorship to the inmate, who then had a right to request a hearing to determine whether the penitentiary's interests of security, order, or rehabilitation were implicated by the censored material. Id. Inmates of the SDSP filed suit challenging the prison's censorship of mail order catalogues containing "marital aids" and that depicted couples in various sexual poses. Id. at 760, 762.

The district court dismissed the lawsuit as frivolous without requiring defendants to respond to the complaint. Id. at 761. The Eighth Circuit affirmed. Id. at 763. The court acknowledged that non-prisoners have a right to receive sexually explicit materials under the guarantee of freedom of speech provided by the First Amendment. Id. at 761 (citing Stanley, 394 U.S. 557). However, the court also recited the "familiar proposition" that "incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Id. (quoting Price, 334 U.S. at 285). First Amendment rights survive incarceration so long as those rights are not inconsistent with the citizen's

status as a prisoner or "the legitimate penological objectives of the corrections system." Id.

The court applied the Martinez least-restrictive-means test, placing the burden on prison officials to justify the censorship.[15] Id. at 762. The court examined the materials the prisoners had provided from their administrative hearings in the prison and concluded that the censorship was justified. Id. In particular, prison officials had written in those hearings that the "materials would tend to make inmates more unsettled in their surroundings and less capable of availing themselves to the rehabilitation programs." Id. Also, that the "materials would lead to abnormal arousal and tend to lead to deviate sexual behavior on the part of some inmates." Id. The prison officials found no or questionable "literary, educational or moral value in the material" and that their "primary purpose . . . is for sexual arousal." Id. at 762-63.

The prisoners did not dispute the characterization of the materials at issue, but argued the materials did not "present a clear and present danger to the penal institution or its security, order and rehabilitation." Id. at 763. The court rejected this argument, holding that the prison's decision that the materials "would have a detrimental effect upon rehabilitation was well within the discretion of the board and requires no further review by the courts." Id.

Judge Lay filed a dissent. Id. at 763-65. He argued the courts were not bound by the conclusory allegations of detriment voiced by defendants in the administrative materials. Id. at 764. Judge Lay stated the majority opinion

---

[15] Carpenter was decided after Martinez but before Turner, so its application of the Martinez standard was appropriate.

abdicated the courts' role to investigate whether a constitutional right was being violated.  <u>Id.</u>  He would have remanded the matter and required defendants to establish their bases for believing the censored materials were detrimental in prison.  <u>Id.</u> at 765.

In <u>Thibodeaux v. South Dakota</u>, 553 F.2d 558, 559 (8th Cir. 1977), Floyd Thibodeaux brought a § 1983 suit alleging officials at the SDSP violated his First Amendment rights by refusing to allow him to receive a magazine called *Mature*, described by defendants as a "club" magazine advertising gay life, swinging, swapping, S & M, AC-DC and discipline.  The district court, as in <u>Carpenter</u>, had dismissed the complaint as frivolous without requiring defendants to answer.  <u>Id.</u>  The Eighth Circuit held its decision in <u>Carpenter</u> was not dispositive and reversed.  <u>Id.</u> at 559-60.

The reason proffered by defendants in the administrative hearing for censoring *Mature* was that the document "had no rehabilitative value."  <u>Id.</u> at 559.  The prison's own censorship standard, however, covered only those materials that "present a clear and present danger to security, order and rehabilitation."  <u>Id.</u> at 560.  The fact that *Mature* did not *advance* rehabilitation was not the same as a finding that *Mature endangered* rehabilitation.  <u>Id.</u> Calling the censorship board's findings in Thibodeaux's case "deficient," the court reversed and remanded.  <u>Id.</u>  <u>Carpenter</u>, the court held, stood for the proposition that the First Amendment allowed prison officials to censor materials if they had a detrimental effect upon rehabilitation.  <u>Id.</u> at 559.  Because there was no finding by defendants in the administrative hearing that

*Mature* was actually detrimental to rehabilitation, the existing record did not show that defendants' actions were constitutional.  Id. at 559-60.

In King v. Dooley, 4:00-cv-04052-LLP, Docket No. 34 (D.S.D. June 16, 2003), the court examined whether the DOC policy in effect in 1999-2000 violated King's First Amendment rights.  Id. at p. 1.  King argued that magazines banned pursuant to the policy such as *Out Law Biker, Easy Rider, Penthouse* and *Hustler,* while they contained pornographic material, also contained written articles relevant to inmate life.  Id.

The DOC policy examined in King prohibited pornography defined as: "books, pamphlets, periodicals, or any other publications that graphically feature nudity or sexually-explicit conduct."  See id. at Docket No. 31, p. 2, ¶ 6. "Nudity" was defined as "a pictorial depiction where genitalia or female breasts are exposed."  Id.  "Feature" meant "the publication contains depictions of nudity or sexually explicit conduct on a routine basis or promotes itself based upon such depictions in the case of individual one-time issues."  Id.  "Sexually explicit" was at that time defined as "a pictorial depiction of actual or simulated sexual acts including sexual intercourse, oral sex or masturbation."  Id. at pp. 2-3, ¶ 6.

King's official capacity claims were dismissed because he had been paroled, thus mooting the issue of whether injunctive relief could issue; damages were held unavailable to King for an official capacity claim.  Id. at Docket No. 34, pp. 4-5.  The court examined the DOC pornography policy under the Turner factors.  Id. at pp. 6-9.  First, the court found a rational

connection between the DOC policy and a legitimate, neutral governmental interest. Id. at pp. 6-8. The governmental interest was security at the prison and rehabilitation of inmates. Id. Pornography in the prison interfered with these twin interests because inmates fought over pornographic materials; the materials found their way into the hands of sex offenders to whom the materials were detrimental; inmates sold, rented and bartered the materials in contravention of other DOC policies; and inmates hid pornographic materials in envelopes marked "legal mail," in the chapel, and in the school. Id. at p. 2.

Second, the court noted alternative avenues of exercising the right to sexually explicit materials were open to inmates. Id. at pp. 8-9. Specifically, the DOC policy did "not ban the receipt of sexually explicit written materials, or provocative, but clothed, depictions of females." Id. at p. 8. The court noted an interpretation of the DOC policy which prohibited depictions of décolletage or photos of partial, but not complete, exposure of female breasts "might not pass constitutional muster." Id. at p. 8 n.5. Because neither party argued the DOC policy went this far, the court reserved the issue of the constitutionality of such a far-reaching ban "for another day." Id.

Third, the King court found allowing inmates access to pornography and imposing the burden of policing such "appropriate" use of pornography on prison officials "would surely drain prison resources." Id. at p. 9. Finally, the court found no ready alternatives to the ban; defendants showed their prior policy of allowing some inmates to possess some pornography was "simply unworkable for security and rehabilitative reasons." Id. Accordingly, every

Turner factor being in defendants' favor, the court granted defendants summary judgment on King's complaint. Id. at p. 10.

In Salinas v. Janklow, 4:99-cv-04204-LLP, Docket No. 28 (D.S.D. June 16, 2003), the court disposed of another challenge to the DOC pornography policy on the same day as King and with identical reasoning. Id. at pp. 7-11. Salinas challenged defendants' denial of access to a pornographic magazine called *Leg World*. Id. at p. 3. He alleged a violation of his First Amendment rights. Id. The Salinas opinion incorporated by reference the reasoning from the King opinion. Id.

In Kaden v. Slykhuis, 651 F.3d 966, 967-68 (8th Cir. 2011), the district court had, on initial screening pursuant to 28 U.S.C. §§ 1915 & 1915A, dismissed Kaden's § 1983 suit challenging the DOC policy prohibiting violent media. At issue was defendants' rejection of a Japanese comic book called *Shonen Jump*. Id. at 968. Applying Turner, the Eighth Circuit remanded. Id. at 969. Because defendants had never been required to respond to Kaden's complaint, the court was unable to discern whether defendants' response to the comic book was "appropriate, or an exaggerated response to prison concerns." Id. The record after remand indicates that defendants subsequently settled with Kaden and his complaint was dismissed pursuant to the settlement. See Kaden v. Slykhuis, 4:10-cv-04043-LLP, Docket No. 60 (D.S.D. Apr. 5, 2012).

In Hughbanks v. Dooley, 2012 WL 346673 at *1, *14 (D.S.D. Feb. 2, 2012), Hughbanks brought suit against defendants in both their individual and

official capacities, alleging the DOC pornography policy—as applied—violated his First Amendment rights. At issue was defendants' rejection of two books, Dirty Spanish and The Quotable Bitch. Id. The court examined Hughbanks' as-applied challenge under the May, 2011, DOC pornography policy. See Hughbanks, 4:10-cv-04064-KES at Docket No. 61-2.

The court dismissed Hughbanks' official capacity claims, holding that Hughbanks had not alleged sufficient facts to show a policy or custom on the part of defendants. Id. at *14. The two incidents alleged by Hughbanks involving the two identified books were insufficient to establish a policy or custom. Id. Alternatively, the court held if Hughbanks could show the Secretary of the Department of Corrections was involved in the rejection of his books, he might establish the requisite policy or custom because the Secretary's action would be "taken by the highest officials responsible for setting policy." Id. at *15. However, Hughbanks never alleged the Secretary was involved in rejecting the books. Id.

As to Hughbanks' individual capacity claims, the court applied the Turner factors. Id. at **17-20. Defendants argued Dirty Spanish was sexually explicit. Id. at *18. Applying a definition of "sexually explicit" that was substantially similar to the definition applicable in Mr. Bell's case, the court agreed.[16] The court found prohibiting Hughbanks access to this depiction was

---

[16] The definition of "sexually explicit" in the DOC policies is as follows. Words which appear in Mr. Bell's version of the DOC policy are underlined and did not appear in the Hughbanks version of the policy:

reasonably related to the underlying penological goal of security, order and rehabilitation.  Id.  Regarding The Quotable Bitch, the court rejected defendants' assertion that it was sexually explicit, but agreed that portions of the book were not conducive to Hughbanks' rehabilitation as a sex offender. Id. at *19.

As to the second Turner factor, the court found alternative means of exercising Hughbanks' First Amendment rights were available because he could obtain a Spanish grammar book that was not sexually explicit and there were other books in the prison library available to him.  Id.  The court found the third Turner factor in defendants' favor because they alleged, and Hughbanks did not contradict, that allowing sexually explicit materials into the prison would be detrimental to prison security and order.  Id.  The fourth Turner factor of "ready alternatives" was decided in defendants' favor because Hughbanks did not articulate any ready alternatives.  Id.  The court then granted summary judgment to defendants on Hughbanks' First Amendment as-applied challenge to the DOC pornography policy.

---

"Sexually explicit" includes written and pictorial, graphic depiction of actual or simulated sexual acts including but not limited to sexual intercourse, oral sex or masturbation.  Sexually explicit material also includes individual pictures, photographs, or drawings, etchings, writings or paintings of nudity or sexually explicit conduct that are not part of a book, pamphlet, magazine, periodical or other publication.

Compare Docket No. 49-2 with Hughbanks, 4:10-cv-04064-KES, Docket No. 61-2.  The example of a "sexually explicit" depiction from Dirty Spanish was a man burying his face in a woman's cleavage, with both parties fully clothed and the caption, "Could I motorboat your . . . ?"  Hughbanks, at *18.

Dean Cochrun, an inmate at the SDSP, filed a § 1983 lawsuit April 13, 2012, which, in Count VII, challenged the DOC's pornography policy. Cochrun v. Weber, 2012 WL 2885565, at *7 (D.S.D. July 13, 2012). Cochrun's claim appeared to present a facial challenge to the policy. See Cochrun v. Weber, 4:12-cv-04071-KES, Docket No. 1 at p. 10. The district court dismissed this claim upon screening under 28 U.S.C. § 1915, stating only that the court had already found the SDSP pornography policy to be constitutional in King and Salinas. Cochrun, 2012 WL 2885565 at *7. No discussion or analysis is contained in the opinion as to changes in the DOC policy between the time King and Salinas were decided and the time the court was evaluating Cochrun's claim. Id. Cochrun did not file a copy of the then-current DOC pornography policy with the court. See Cochrun v. Weber, 4:12-cv-04071-KES. The policy does not otherwise appear of record in the case. Id.

### b. Administrative Exhaustion

Before beginning the analysis of the pornography policy in this case, the court addresses the defendants' assertion that Mr. Bell has not exhausted his administrative remedies as to this claim. Contained within the record is evidence that Mr. Bell did exhaust his administrative remedies as to his claim that the defendants wrongfully rejected Mr. Bell's May, 2016, issue of *Military History*. See Docket 1-1, pp. 30, 31, 33, 35. The defendants nevertheless assert Mr. Bell did not properly exhaust, however, because he did not specifically state within his grievance forms that he believed he should be allowed to have the magazine *because one of the exceptions to the policy should*

70

*apply.* See defendants' reply brief, Docket 109, at p. 34. Instead, during the grievance process, Mr. Bell simply argued he did not think Policy 1.3.C.8 should apply to the magazine because "any kid can buy it." See e.g. Docket 1-1, p. 35 (Mr. Bell's handwritten request for administrative remedy form).

In 1996 Congress enacted the Prison Litigation Reform Act, 110 Stat. 1321-71, as amended, 42 U.S.C. § 1997e *et seq*, in order to reduce frivolous litigation emanating from the nation's prisons. Woodford v. Ngo, 548 U.S. 81, 84 (2006). One part of that Act was codified at 42 U.S.C. § 1997e(a) which requires administrative exhaustion as follows:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

See 42 U.S.C. § 1997e(a).

Exhaustion under § 1997e(a) is mandatory, requires prisoners to exhaust all "available" remedies, and is required even where the relief sought (i.e. money damages) is not available through administrative avenues. Woodford, 548 U.S. at 85. Exhaustion is required for any suit challenging prison conditions, even if the suit is not brought under § 1983. Id. "Prison conditions" means "all inmate suits about prison life, whether they involve general circumstances in prison or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). Finally, in order to satisfy § 1997e(a), the prisoner must properly exhaust. Woodford, 548 U.S. at 93. It is not sufficient for the prisoner to show

that, although he has procedurally defaulted his administrative claim, there is no further avenue of administrative action open to him.  Id. at 93-103.

Failure to exhaust administrative remedies is an affirmative defense which the defendant must plead and prove.  Jones v. Bock, 549 U.S. 199, 212 (2007).  The PLRA itself contains no requirement that every defendant named in the § 1983 lawsuit have previously been named in the prisoner's administrative complaint.  Id. at 217-18.  Rather, whether a prisoner has properly exhausted must be determined from the prison regulations themselves.  Id. at 218-19.  Those regulations, not the PLRA, "define the boundaries of proper exhaustion."  Id. at 218.

Although a prisoner is not required to plead facts supporting exhaustion in his or her complaint, dismissal at the screening stage for failure to exhaust may be allowed if the allegations in the complaint show conclusively that the affirmative defense is established in a particular case.  Id. at 215-16.  If a complaint contains both exhausted and unexhausted claims, the court should decide the exhausted claims on their merits and dismiss without prejudice the unexhausted claims.  Id. at 224.

The form provided by the South Dakota DOC for both the informal resolution request and the request for administrative remedy (See Docket 1-1 pp. 35 and 42) asks the inmate to describe his problem or complaint, and the action he requests.  Regarding the rejection of the *Military History* magazine, Mr. Bell described the problem as "SCO Moisan rejected my *Military History* Magazine."  Docket 1-1, p. 35.  The action he requested was "I'm requesting

72

this magazine be given to me." This court does not perceive that, to properly exhaust this claim, Mr. Bell was required to include an instruction to the defendants regarding how they should have applied a particular exception to Policy 1.3.C.8 (the pornography policy) in order to allow Mr. Bell to possess the magazine. The SDDOC administrative remedy procedure for inmates (Policy 1.3.E.2) is familiar to this court and can be found on the internet. See https://doc.sd.gov/documents/about/policies/Administrative%20Remedy%20 for%20Inmates.pdf (last checked June 27, 2018).

After he filed this lawsuit and obtained appointed counsel, Mr. Bell became more savvy and about filing his grievances and he did request that the exception be applied to magazines which were rejected subsequent to the May, 2016, issue of *Military History*.[17] But this court finds nothing in Policy 1.3.E.2 that requires such specificity in order to properly exhaust a claim pursuant to 42 U.S.C. § 1997e(a) before bringing a civil rights lawsuit to federal court. The defendants' motion for summary judgment will therefore not be granted on this claim on the grounds that Mr. Bell failed to properly exhaust his administrative remedies.

---

[17] The grievances Mr. Bell filed which specifically requested the defendants to apply the exception were filed by Mr. Bell many months after this lawsuit had been pending. See e.g. Docket 126-8 (Mr. Bell asserts in his informal resolution request that the "educational" exception should apply to his rejected *National Geographic History* magazine and asks the defendants to mail the magazine to his attorney).

### c.    The Merits of Mr. Bell's *Military History* Claim

Mr. Bell's complaint articulates a facial challenge and an as-applied challenge to the SDDOC pornography policy. Again, pursuant to the Sisney directive, this court begins with the as-applied analysis.

Pursuant to Payne, the court inquires "whether the regulation or policy at issue under which the mail is being held is valid and neutral and whether it addresses a legitimate penological concern." Payne, 749 F.3d at 701-02. Further, "[a] qualified immunity analysis will then require the district court to conduct an independent review of the evidence to determine if the officials have demonstrated an exaggerated response to those penological concerns in relation to a particular item of mail that has been confiscated." Id. at 702. If a valid regulation is applied to a particular piece of mail in a way that negates the legitimate penological interest, the regulation may be unconstitutional as applied to those items. Id. (citing Kaden, 651 F.3d at 969.

The court applies Turner using those factors which lend themselves to the facts and circumstances that are applicable. The analysis applies equally to facial and as-applied First Amendment challenges. Bahrampour 356 F.3d at 975; Lyon, 803 F. Supp. at 1552. When resolving an as-applied challenge, the question for the court is whether the ban on the particular item was reasonably related to the legitimate penological objectives put forth for the policy as articulated by the prison officials. Dean, 2013 WL 11322613 at *8. The duty of the court is to " 'make sure after an independent review that the regulation is not an exaggerated response to prison concerns.' " Id.

The court now turns to the rejection of the May, 2016, issue of *Military History,* pursuant to Policy 1.3.C.8 as the defendants applied it to Mr. Bell. The defendants submitted evidence that page 25 of the magazine contained a reproduction of a painting of a battlefield which included a depiction of a bare-breasted woman. <u>See</u> Docket 109-15.

The first <u>Turner</u> factor is whether the governmental objective underlying the regulation is legitimate and neutral, and whether the regulation is rationally related to that governmental objective. The objective articulated for banning pornography pursuant to Policy 1.3.C.8 is "the rehabilitation of inmates, maintenance of security and order within the institution by reducing the risk of sexual assaults among inmates and he prevention of sexual harassment of prison staff." Moisan affidavit, Docket 59, ¶ 14; Young affidavit, Docket 56, ¶ 32. That objective is clearly legitimate and neutral.

The second half of the inquiry is whether the regulation is rationally related to that governmental objective. The manner articulated by the defendants in which the policy furthers the regulation is as follows: If publications depicting pornography were allowed within the SDSP, such publications would likely be passed around and ultimately would find their way into the cells of psychologically unfit inmates, which would interfere with efforts to rehabilitate those inmates. Inmates within the SDSP have been known to barter or sell such images in the past in contravention of SDSP policies. The bartering of these images has been a problem, even among inmates prohibited from possessing them within the SDSP. Such images or

drawings could also lead to an increase in sexual behaviors among inmates, which in turn could lead to an increase in the number of sexual assaults or other forms of sexual harassment committed by inmates within the prison. Pornographic materials are, by their very nature, likely to lead to sexual arousal among the inmates that view them and could therefore cause those inmates to act out their sexual aggression toward other inmates or prison staff. Allowing sexually explicit material inside the prison walls would also facilitate/encourage a hostile work environment for prison staff. It would encourage inmates to view women as sexual objects and undermine the authority of female correctional officers. <u>See</u> Moisan affidavit, Docket 59, ¶¶ 8-13; Young affidavit, Docket 56, ¶¶ 27-31

At the outset, the court finds that the drawing found on page 25 of the May, 2016, issue of *Military History* fits squarely within the definition of "nudity" as the term is defined by the policy because the drawing includes an image of a female whose bare breasts are exposed.

This narrow portion of Policy 1.3.C.8 (the prohibition of possession of material by SDDOC inmates which is deemed pornographic because it features "nudity" –defined as is relevant here, exposed female breasts) is rationally related to the defendants' stated objective of the rehabilitation of inmates, maintenance of security and order within the institution by reducing the risk of sexual assaults among inmates and he prevention of sexual harassment of prison staff. The duty of the court is to " 'make sure after an independent review that the regulation is not an exaggerated response to prison concerns.' "

Dean at *8 (quoting Lyon, 803 F. Supp. at 1550 (quoting Salaam, 905 F.2d at 1171)).  When resolving an as-applied challenge, the question for the court is whether the ban on the particular item was reasonably related to the legitimate penological objectives put forth for the policy as articulated by the prison officials.  Dean, 2013 WL 11322613 at *8 (citing Williams, 116 F.3d at 354).

The May, 2016, issue of *Military History* was rejected based on a straightforward application of the definition of "nudity" as it is contained in the policy itself.  The court can perceive no exaggerated response to a legitimate prison concern.   The defendants have articulated a legitimate penological objective for the policy which bans depictions of a woman's bare breast, and the May, 2016, issue of *Military History* contained such a depiction.

The next Turner factor is whether there are alternative means of exercising the right that remain open to the plaintiff.  Murchison, 779 F.3d at 892.  Here, the defendants have explained there are plenty of books available to inmates on a variety of subjects in the prison library.  They argue Mr. Bell has not been deprived of his First Amendment right to free speech/freedom of expression by being deprived of access to reading materials, even if he was deprived of the specific issue of *Military History* he wished to receive.  See Young affidavit, Docket 56, ¶¶ 20-21.  Warden Young explains that the SDSP has a "relatively large" library with over 4,900 books including fiction and non-fiction.  Id.  Inmates may request a specific title, author, or genre by "simply submitting a kite request to the teacher assigned to the Jameson Prison Annex.

Moreover, additional books are ordered for the library as funds become available."  Id.

The case law instructs that "[i]n evaluating this factor, 'courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation.' " Murchison, 779 F.3d at 891 (citing Turner, 482 U.S. at 90).  "In considering this factor, 'the right in question must be viewed sensibly and expansively.' " Id. (quoting Thornburgh, 490 U.S. at 417).  In Murchison, for example, the court explained the question was not whether inmate Murchison had alternate ways to read the particular issue of Newsweek magazine he wished to receive, but instead whether he had other ways to educate himself about the issues contained within that issue of Newsweek (the Mexican drug cartels and free press issues in Mexico, for example).

Here, the court therefore interprets the appropriate inquiry as whether Mr. Bell had alternate avenues of reading about military history available to him—in books or periodicals which do not contain nudity.   There is no evidence in the record to indicate whether books or periodicals on this particular subject were available, but Warden Young's affidavit indicates Mr. Bell could have requested such books to be placed in the library for general inmate use had he wished to do so.  This Turner factor therefore weighs in favor of finding the defendants did not apply Policy 1.3.C.8 in an unconstitutional manner as to Mr. Bell.

The fourth Turner factor is whether there are ready alternatives to the regulation at a *de minimis* cost. The absence of a ready alternative is evidence of the reasonableness of the prison regulation, while an alternative that fully accommodates the prisoner's right at *de minimis* cost to valid penological interests is evidence that the regulation does not satisfy the reasonable relationship standard. Murchison, 779 F.3d at 892 (citing Turner, 482 U.S. at 90-91).

Here, Mr. Bell argues that the alternative found within the policy itself should have been applied to him and because it was not, the Policy was applied to him in an unconstitutional manner. The alternative to which the court refers is the application of the enumerated exceptions contained within the definition of "nudity" in Policy 1.3.C.8. The exception states, "published material containing nudity that is illustrative of medical, educational, or anthropological content *may* be excluded from this definition." See Docket 54-2, p. 1 (emphasis added). The reproduction found on page 25 of the May, 2016, issue of *Military History* could have been a worthy candidate for the exception. The court notes that the language in the exception is not mandatory, however.

The burden on the fourth Turner factor is on Mr. Bell. He has not brought to the attention of this court any particular personal characteristic that should exempt him from the general guidelines contained within the policy. Mr. Bell cannot now be heard to complain that prison officials do not make inquiry into the personal characteristics of inmates before rejecting a

prohibited publication when Mr. Bell himself made no effort to bring any such characteristics to the attention of the prison officials or to this court.

Mr. Bell has not offered any reason to this court why one of the exceptions should be applied to his otherwise prohibited mail. For instance, was Mr. Bell enrolled in a course of study which required him to learn about military history or renaissance period art? Is there something in particular about Mr. Bell's psyche that sets him apart from other inmates and which requires him to have this magazine, while others are generally prohibited from possessing it because it violates Policy 1.3.C.8? Is it Mr. Bell's position that the exception should be applied to the magazine across the board, allowing all inmates to possess it?

The court does not imply that enrollment in a course of study is required for the exception to apply to Policy 1.3.C.8, and the defendants have not indicated that it is. But Mr. Bell has simply presented <u>no</u> reason to the court in support of his argument that the exception should have been applied to his receipt of the May, 2016, issue of *Military History* (or for that matter, to any of the other magazines or books he claims have been rejected since the May, 2016, issue of *Military History*). Nor has he argued the exception should have been applied to the *Military History* magazine in the same manner across the board to all inmates who wished to possess it (i.e. that everyone—not just Mr. Bell—should have been allowed to possess the May, 2016, issue of *Military History* based upon the application of the exception to Policy 1.3.C.8).

In the absence of some indication to this effect by Mr. Bell, the defendants are placed in the untenable position of having to re-evaluate and scrutinize each and every incoming mail item that is otherwise prohibited by the Policy. The defendants should not be forced to guess whether a rejected item will later be subjected to a claim that an exception to the Policy *should have* been applied, based upon circumstances about which they were unaware. In the absence of some simultaneous justification for the exception to apply, the exception would swallow the rule. Nearly every book or magazine that is otherwise in violation of the Policy could be creatively argued to contain "nudity illustrative medical, educational, or anthropological content" –depending upon the subject about which the inmate belatedly claims he wants to learn or needs to know.

The First Amendment does not require the defendants to apply the exception to Policy 1.3.C.8 based solely upon Mr. Bell's belatedly expressed belief that the exception should apply. See Ashker v. Schwarzenegger, 2009 WL 801557 at * 11 (N.D. Cal. Mar. 25, 2009) (prison policy which prohibited pornography but contained exceptions did not require prison to allow inmate to possess materials solely because the inmate desiring the magazine in question believed it had artistic value). In Ashker, the prison officials denied the inmate access to a magazine which the inmate claimed should have been allowed pursuant to the exception to the prison's pornography policy, which was very similar to the exception contained in Policy 1.3.C.8. The inmate advocating for acceptance of the magazine brought an as-applied challenge to the prison

officials' denial of the magazine under the policy, arguing it should have been allowed under the "artistic" portion of the policy's exception.  Id. at  *11.

The court began by noting that prison officials have broad discretion to determine what publications may enter their prisons.  Id.  Regulations that provide for individualized determinations as opposed to categorical exclusion strike the appropriate balance between the prison's legitimate interests and the prisoner's First Amendment rights.  Id.  "Although [the policy] allows inmates to possess some sexually explicit materials, it does not require that inmates be allowed to possess sexually explicit materials solely because they believe it has artistic value."  Id.

In Ashker the plaintiff was a biker who claimed entitlement to a biker magazine that contained nudity.  After incarceration, the prisoner lamented the loss of his connection to the biker culture and lifestyle.  He also claimed the magazine contained "biker art" which was the type of art he liked to do.  The court rejected this claim, noting the plaintiff had "no constitutional right to this connection.  [Plaintiff has] access to other educational or art materials that do not contain frontal nudity or that meet the requirements of [the pornography policy] and [plaintiff has] access to any biker lifestyle magazines that do not display frontal nudity."  Id.

In another similar case, the prison pornography policy again contained an exception very similar to Policy 1.3.C.8.  In Baasi v. Fabian, 2010 WL 924384 (D. Minn. Mar. 11, 2010) the prison's pornography policy excluded "medical, educational, or anthropological content in certain circumstances."

Id. at * 13.  The plaintiff prisoner, Mr. Baasi, brought suit because he wished to possess a book entitled *The Naked Woman: A Study of The Female Body.*  Id. at *1.  He found the book listed in the anthropology section of a bookseller catalog.  Id.  Mr. Baasi ordered the book, but when it arrived at the prison, it was confiscated.  During the grievance process, Mr. Baasi was informed that in order the be allowed to possess the book pursuant to the exception to the prison's pornography policy, he would be required to be enrolled in an educational course for which it was required.  Id.   Mr. Baasi filed suit.

During the litigation, the issue was narrowed to whether the manner in which the prison officials' applied the exception to the pornography policy was constitutional.  Namely, whether it was constitutional to apply the exception only if the inmate was enrolled in an educational course of study that required the otherwise prohibited material.  Id. at *2.  Mr. Baasi did not contest that the book he wished to possess otherwise violated the pornography policy, or that the requirement to be enrolled in an educational course for the exception to apply was applied to all prisoners within the Minnesota correctional facility where he was confined.  Id. at * 13.  Though Mr. Baasi had been told by the property officer that if Baasi ordered the book it would be confiscated, the written policy did not contain the requirement that in order for the exception to apply, the inmate must be enrolled in an educational course that required use of the otherwise prohibited material.  Id. at *14. The court, however, found that the prison officials nevertheless were not required to apply the exception to Mr. Baasi's request for the book:

> Given the purposes behind [the pornography policy] we find nothing unreasonable about a requirement that a prisoner be a serious student of anthropology, or medicine, or some other educational pursuit, in order to have access to sexually explicit materials in the confines of a prison. Most any prisoner can claim to be a serious student of the arts, or of the sciences, if the reward is to possess sexually explicit materials that would otherwise be denied to him or her, for the very reasons that prompted the promulgation of the contraband policy in the first place.

Id.

The court concluded by observing that Mr. Baasi did not make any claim whatsoever that he was a serious student of anthropology or medicine or any other educational discipline. Id. Instead, Mr. Baasi's claim seemed to be like that of "Cinderella's step-sisters." Id.

> [I]f you can conceivably pinch and strain to force an object –here a sexually explicit book—into an exception in which it plainly does not fit—here an exception for serious educational study—then all of the penological purposes in keeping sexually explicit materials out of prisons should be disregarded. We think not. If the need to purge the confines of a prison of sexually explicit materials has merit—and the Courts have universally accepted that it has, . . . then that meritorious purpose should not be so illusory as to be averted by anyone asserting an interest in some educational pursuit on an individualized, self-proclaimed basis. In the context of an educational course, with the supervision of a course instructor, the potentiality that sexually explicit texts would infiltrate throughout the prison will be significantly curtailed. Accordingly, the defendants have demonstrated, not only that the contraband policy has a 'logical relation' to prison security, but has also shown that relation to be reasonable.

Id. at *14. The Baasi court completed the as-applied analysis by examining the remaining Turner factors, and concluding that prison officials did not violate Mr. Baasi's First Amendment rights by declining to apply the exception to Mr. Baasi's desire to possess *The Naked Woman: A Study of The Female Body*. Id. at *16.

The prison's pornography policy, and in particular its application to an issue of *National Geographic* magazine was the subject in Moses v. Dennehy, 523 F. Supp. 2d 57, 65 (D. Mass. 2007). In Moses, the court first held that the prison's pornography policy in general was constitutional. Id. at 63. The policy, like Policy 1.3.C.8, contained an exception for nude depictions that were "medical, educational or anthropological" in nature. Id. at 65. The plaintiff prisoners argued that the application of the policy to certain publications (including *National Geographic*) was unconstitutional because the exceptions to the policy should have been applied but were not. Id. at 65.

The court began by noting that some publications were banned on a blanket basis (*Hustler, Maxim, High Society*) for example. The court took judicial notice that the policy was properly applied to these publications. Id. at 64. Other publications, however, such as *National Geographic*, might only occasionally contain material which implicated the policy. Id. The court further questioned whether all nudes (i.e. classical paintings) implicated the concerns addressed by the policy. Id. at p. 65. This, the court concluded, was the reason for the exceptions contained within the policy. Id. "With all this in mind, however, this court must still afford substantial deference to the prison officials' individualized determinations." Id. Where prison officials had determined a particular publication contains banned content, "the prisoners bear a heavy burden to demonstrate [the policy] was applied in an arbitrary and impermissible fashion." Id. (citing Thornburgh, 490 U.S. at 416).

Though the prisoners argued the *National Geographic* should have come within the policy's exception, the court noted they failed to show that the defendants applied the policy in a "wholly irrational" manner. Id. "This court cannot step into the daily operations of the prison to determine whether every magazine or book sent to the prisoners violates [the policy]." Id. Because the plaintiff prisoners made no strong showing that the decision by the prison officials was "without support in reason," the court deferred to the prison officials' determination that the exception to the pornography policy would not apply to the issue of *National Geographic*. Id.

Here, Mr. Bell has offered no particular reason that the exception to Policy 1.3.C.8 should have been applied to the May, 2016, issue of *Military History*—other than Mr. Bell thinks it should have. Again, the court reiterates that the burden for the fourth Turner factor is on Mr. Bell to show an alternative that fully accommodates his rights is available at deminimus cost. Absent something more, this court will not overrule the determination made by defendants herein. "Prison officials have broad discretion to censor or restrict an inmate's receipt of a publication to serve a legitimate penological interest— including the need for institutional security...." Murchison, 779 F.3d at 887 (citing Ivey v. Ashcroft, 62 F.3d 1421 (8th Cir.1995) (unpublished)). The Murchison court acknowledged, "we must 'recognize and defer to the expertise of prison officials on what is likely to be inflammatory in the prison environment.' " Id. (citing Murphy, 372 F.3d at 986). All that is required is that the court must conduct " 'an independent review of the evidence' to determine

if there has been 'an exaggerated response to prison concerns' in relation to this particular item." Id.

In Murchison, the court cited Kaden, 651 F.3d at 969 and Murphy, 372 F.3d at 986 for the proposition that "[S]ummary judgment [is] appropriate only if [the prison officials] present [ ] some specific evidence of why this particular item implicates prison concerns." Murchison, 779 F.3d at 888. But, the Murchison court pointed out that the "some evidence" the prison officials presented in that case constituted the copy of the *Newsweek* magazine that had been rejected, along with evidence that they had reviewed the content in that specific issue of *Newsweek* and deemed it to be in violation of their policy (rather than, for instance, there being a blanket ban on *Newsweek* within he institution). Accordingly, the court held, there was sufficient evidence in the record to support summary judgment, and for the court to afford deference to the judgment of the prison officials regarding the application of the policy to the particular *Newsweek* issue. Murchison, 779 F.3d at 890-91. The same is true here.

Qualified immunity is analyzed in two steps. The first is whether the defendants violated the plaintiff's constitutional right. Saucier, 533 U.S. at 201. Here, the court finds the defendants did not violate Mr. Bell's First Amendment rights when they did not allow him to have the May, 2016, issue of *Military History*. Because the answer to this first question is "no," "there is no necessity for further inquiries concerning qualified immunity." Id.; Ambrose, 474 F.3d at 1077.

**E.     Retaliation Claim (Count 3, Defendants Mousel and Young)**

Mr. Bell asserts the defendants retaliated against him for exercising his constitutional right to access the courts.  Specifically, he asserts they retaliated against him for filing a previous lawsuit in 2014.  The previous lawsuit (Civ.No. 14-04111, United States District Court, District of South Dakota) was dismissed on the defendants' summary judgment motion[18] by the district court on September 9, 2015.  <u>See</u> Docket Nos. 75 and 76 in that case.  The Eighth Circuit affirmed the dismissal on May 20, 2016.  <u>Id.</u>, Docket Nos. 86 and 87.

The court prefaces the discussion of this claim by noting that, of the prison officials who Mr. Bell asserts retaliated against him for filing the previous lawsuit (CO Mousel regarding the rejection of books, Warden Young and UC Steinecky regarding the refusal to provide kites, Nurse Smythe, CO Arop, Major Benting and CO Flick regarding the "chow hall" fight and its aftermath), Mr. Bell has named only CO Mousel and Warden Young as parties in this lawsuit.  Only Mousel and Young's liability for retaliation, therefore, will be evaluated by the court.

"A prisoner's Eighth Amendment rights are violated if prison officials 'impose a disciplinary sanction against a prisoner in retaliation for the prisoner's exercise of his constitutional right.'" <u>Meuir v. Greene County Jail Employees</u>, 487 F.3d 1115, 1119 (8th Cir. 2007).  <u>See also</u> <u>Haynes v. Stephenson</u>, 588 F.3d 1152, 116 (8th Cir. 2009).  A *prima facie* case of retaliatory discipline requires a plaintiff to show (1) that he exercised a

_____

[18] Darin Young was the only defendant named in that lawsuit who is also named in this lawsuit.

constitutionally protected right, (2) that he was subsequently disciplined by prison officials, and (3) the motive for imposing the discipline was the exercise of the constitutional right.  Meuir, 487 F.3d at 1119.

To prevail on a claim of retaliation for violation of a First Amendment right, the plaintiff must show (1) that he engaged in a protected activity, (2) that the government defendant took adverse action against the plaintiff that would chill a person of ordinary firmness from continuing in the activity; and (3) that the adverse action was motivated at least in part by the exercise of the protected activity.  Santiago v. Blair, 707 F.3d 984, 991 (8th Cir. 2013).

The third element of the *prima facie* case requires the plaintiff to show that, "but for" the retaliatory motive, the disciplinary action would not have been taken.  Haynes, 588 F.3d at 1156.  The "but for" test applies to the defendants' motive, not to causation.    Beaulieu v. Ludeman, 690 F.3d 1017, 1025 (8th Cir. 2012).   The "causal connection is generally a jury question, . . . [but] it can provide a basis for summary judgment when the question is so free from doubt as to justify taking it from the jury." Beaulieu, 690 F.3d at 1025. Where the disciplinary action takes place "almost immediately" after a defendant learns of the protected constitutional activity, there is a sufficient nexus in time to show causation.  Haynes, 588 F.3d at 1156-57.  A span of three days between the alleged retaliation and the conclusion of the plaintiff's exercise of his constitutional rights was a sufficiently close nexus in time to stave off summary judgment.  Santiago v. Blair, 707 F.3d 984, 993 (8th Cir. 2013).  Where the allegedly retaliatory action takes place *before* a defendant

knows that the plaintiff exercised a constitutional right, summary judgment in favor of the defendant is appropriate. <u>Beaulieu</u>, 690 F.3d at 1025-26.

The court begins with Mr. Bell's first allegation of retaliation—CO Mousel's rejection of books received from Parallax Press and Bound Together Bookstore. The record reflects these actions occurred between December, 2015 and February, 2016 (Docket 1-1, p. 42 and Docket 1-1, p. 53). By this time, Mr. Bell had in fact filed his first civil rights lawsuit. Mr. Bell has proven the first element of his prima facia case –that he had exercised constitutionally protected right to access the courts. <u>Santiago</u>, 707 F.3d at 991.

Mr. Bell stumbles on the third element of his prima facie case, however—that he was disciplined by prison officials because of the protected activity. This is because there is no evidence that CO Mousel—the person who rejected the books—was a party to the first lawsuit, or even that CO Mousel knew anything about the first lawsuit, including that Mr. Bell had ever filed it. A causal link between the protected activity and adverse action "does not exist if the [decision maker] is not aware of the protected activity." <u>Culton v. Missouri Dept. of Corrections</u>, 515 F.3d 828, 831 (8th Cir. 2008). CO Mousel could not have punished Mr. Bell for exercising a right that CO Mousel did not know Mr. Bell had exercised.

Also, the temporal relationship is not strong—the first lawsuit had been dismissed as meritless by this court at least three months earlier. Where the disciplinary action takes place "almost immediately" after a defendant learns of the protected constitutional activity, there is a sufficient nexus in time to show

causation.  Haynes, 588 F.3d at 1156-57.  Three months is not "almost immediately."  In Kipp v. Missouri Hwy and Transportation Comm'n, 280 F.3d 893, 897 (8th Cir. 2002), the court held in a Title VII retaliatory discharge case that a two-month interval between the protected activity and the claimed retaliation "so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in [plaintiff's] favor on the matter of a causal link."  The same is true here, especially when there is no evidence the decision maker (Mousel) ever learned of the previous lawsuit.

Most importantly, however, Mr. Bell has produced no evidence that CO Mousel implemented OM  2.C.3.4 any differently as to Mr. Bell than he did to any other inmate.  Though it appears the policy has been applied haphazardly, there is no evidence it has been applied any more haphazardly to Mr. Bell than it has to any other inmate at the SDSP.  In other words, Mr. Bell has produced no evidence that CO Mousel allowed new, donated books from non-religious sources to be delivered to other inmates while not allowing such books to be delivered to Mr. Bell.  In the absence of such evidence, Mr. Bell cannot show retaliation.  See Harp v. Mike Durfee State Prison, 2012 WL 2328237 (D.S.D. June 19, 2012).  In Harp, the court observed that the plaintiff could not prevail on the third element of the prima facie case of his retaliation claim because he failed to provide any evidence that the treatment he claimed was retaliatory (the defendants' failure to provide him with adequate law library

resources) was any different than the treatment received by all the other inmates at Mike Durfee State Prison.  Id. at * 3.

> [H]e does not allege that other prisoners are allowed more access or that defendants have specifically restricted *his* access.  Thus, Harp has not shown that *his* access to the library was restricted *in response* to his lawsuit.  Rather, he complains about currently existing conditions that apply to all inmates.  Thus, he has not established a prima facie case of retaliation on these facts.

Id.  Despite the court's finding in section C.1. above that the manner in which OM 2.C.3.4 was applied to Mr. Bell's books from Parallax Press and Bound Together Bookstore was unconstitutional,  Mr. Bell has not alleged or provided any proof that Mr. Mousel or Warden Young applied OM 2.C.3.4 any differently to him than it was applied to the other inmates confined at SDSP.  For this reason as well, Mr. Bell's retaliation claim against CO Mousel and Warden Young as to the application of OM 2.C.3.4 fails.

The next manner in which Mr. Bell asserts the defendants retaliated against him is the manner in which prison personnel responded to an altercation in which Mr. Bell was involved on February 1, 2017.  Mr. Bell alleges that prison personnel who witnessed the fight did not respond quickly enough, that after the fight he was placed in the SHU with nothing but a security gown for retaliatory reasons, and that (also for retaliatory reasons) he received slow or inadequate medical care.  The persons who were involved in these alleged actions submitted affidavits to support the defendants' motion for summary judgment, but none of those persons are named defendants in this lawsuit.

Neither Denny Kaemingk, Warden Young, nor Associate Warden Dreiske may be held accountable for the actions of these un-named prison employees. To be liable, an official must be personally involved in a constitutional violation, or must, through deliberate inaction, tacitly authorize it. Ripson v. Alles, 21 F.3d 805, 809 (8th Cir. 1994). "A warden's general responsibility for supervising the operations of a prison is insufficient to establish personal involvement." Ouzts v. Cummins, 825 F.2d 1276, 1277 (8th Cir. 1987). Public officials cannot be held liable for claims brought under § 1983 based on respondeat superior. Choate v. Lockhart, 7 F.3d 1370, 1376 (8th Cir. 1993). "[A] supervisor may not be held vicariously liable under § 1983 for an employee's actions." Liebe v. Norton, 157 F.3d 574, 579 (8th Cir. 1998). This portion of Mr. Bell's retaliation claim, therefore, fails on the merits without further discussion.

The next manner in which Mr. Bell claims defendants retaliated against him is the denial of his request for grievance forms. Mr. Bell claims UC Steinecky denied his request for the forms. Again, this person is not a named party to this lawsuit. On September 16, 2016, Warden Young responded to Mr. Bell's grievance about the issue. See Docket 126-2, p. 25. In this instance, however, Warden Young's response to Mr. Bell's request for administrative remedy is not enough to subject him to liability for Mr. Bell's retaliation claim. The "something more" than simply responding to the grievance is not present here. Thomas, 584 Fed. Appx. 291. Warden Young did

not insert himself into the controversy, nor is the creation or interpretation of a policy at issue in this instance.

Even assuming the "something more" is present to subject Warden Young to liability for retaliation based solely on his response to Mr. Bell's request for administrative remedy, the claim would fail on the merits as to Warden Young. Though Warden Young was presumably aware of Mr. Bell's 2014 lawsuit (having been a named defendant in that action)[19] the causal connection cannot be made between Warden Young's unfavorable response to Mr. Bell's request for administrative remedy in September, 2016, and Mr. Bell's previous lawsuit.

This is because the 2014 lawsuit was dismissed by the South Dakota District Court on September 9, 2015, and by the Eighth Circuit Court of Appeals on May 20, 2016. So, by the time Warden Young acted on Mr. Bell's request for administrative remedy in September, 2016, the 2014 lawsuit had been dismissed by this court for over a year and even the Eighth Circuit appeal had been decided in Warden Young's favor some four months earlier. Where the disciplinary action takes place "almost immediately" after a defendant learns of the protected constitutional activity, there is a sufficient nexus in time to show causation. Haynes, 588 F.3d at 1156-57. Neither a year nor four months qualifies as "almost immediately." Given the number of lawsuits

---

[19] Even this fact is not a given. A quick review of the court's CM/ECF system shows that Warden Young has been named in over 50 prisoner civil rights lawsuits in this district since 2014. Fifteen are currently pending. Whether Warden Young personally keeps personal track of each of these prisoner lawsuits is unknown.

prisoners file against Warden Young, it is quite a stretch to believe that

Mr. Bell's 2014 suit which had been dismissed as meritless and which

dismissal had by then been affirmed by the Eighth Circuit Court of Appeals

four months previous, was at the forefront of Warden Young's mind for

purposes of retaliating against Mr. Bell.  This claim fails on the merits.

Qualified immunity is analyzed in two steps.  The first is whether the

defendants violated the plaintiff's constitutional right.  <u>Saucier</u>, 533 U.S. at

201.  Here, the court finds the defendants did not violate Mr. Bell's

constitutional right because Mr. Bell has failed to prove the elements necessary

to show a prima facie claim of retaliation.  Because the answer to this first

question is "no," "there is no necessity for further inquiries concerning

qualified immunity." <u>Id.</u>; <u>Ambrose</u>, 474 F.3d at 1077.

## F.     Fourteenth Amendment Claim:  Equal Protection "Class of One." (Count Four, Defendants Mousel, Moisan, Kaemingk, Young and Dreiske)

In count four of his amended complaint, Mr. Bell asserts the defendants

have violated his Fourteenth Amendment right to Equal Protection under the

law.  Mr. Bell asserts that, in a variety of ways, the defendants singled him out

for disparate treatment, and have therefore created a "class of one," thereby

denying him equal protection under the law in violation of the Fourteenth

Amendment of the United States Constitution.  The ways in which Mr. Bell

alleges the defendants have singled him out are:  (1) by deciding to reject his

books and magazines; (2) by deciding to place him in a holding cell with only a

safety gown after the February 1, 2017, altercation in the chow hall; (3) by

providing inadequate medical care after the February 1, 2017, altercation; (4) by failing to provide him grievance forms; and (5) in the case of supervisors who were not personally involved in these actions, by knowing of the wrongful conduct but failing to intervene or failure to supervise, or by creating a policy or custom that permitted the conduct to occur.

A "class of one" Equal Protection claim was recognized by the Supreme Court in <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562 (2000) (*per curiam*). In <u>Olech</u>, property owners the Olechs asked the village to allow them to connect to the village water supply. <u>Id.</u> at 563. The village granted the request, but conditioned it on the Olechs granting the village a 33-foot easement. <u>Id.</u> All other property owners who had been granted permission to connect to the village water supply were required to grant the village only a 15-foot easement. <u>Id.</u> The Olechs brought suit, alleging that the village violated the Olech's Equal Protection rights. <u>Id.</u> The Olechs asserted that the village acted pursuant to a retaliatory motive arising out of an earlier, unrelated successful lawsuit brought by the Olechs against the village. <u>Id.</u>

The Court held that the Olechs' complaint was sufficient to plead a class of one claim: a claim that defendant intentionally treated plaintiff differently from others similarly situated and that there is no rational basis for the different treatment. <u>Id.</u> Such claims are cognizable under the Equal Protection clause because they are consistent with the purpose of that clause—"to secure every person within the State's jurisdiction against intentional and arbitrary discrimination." <u>Id.</u>

After the Olechs decision, the Supreme Court clarified that the class of one claim does not apply in the public employment context. See Engquist v. Oregon Dept. of Agr., 553 U.S. 591, 598 (2008). In distinguishing Olechs, the Engquist Court emphasized that the facts of the earlier case involved "the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed," while the employer-employee context by its very nature "involve[s] discretionary decisionmaking based on a vast array of subjective, individualized assessments." Engquist, 553 U.S. at 602-03.

In the Eighth Circuit, the class of one claim has been held inapplicable to a county weed board's enforcement of the noxious weed abatement provisions. See Novotny v. Tripp County, SD, 664 F.3d 1173, 1178-79 (8th Cir. 2012). The court likened the defendants' challenged actions in that case to a police officer faced with a highway full of speeding motorists where the officer gives only one speeder a traffic citation. Id. at 1179 (citing Engquist, 553 U.S. at 603-04).

The Eighth Circuit also applied the class of one analysis to a prison inmate who alleged that he was being discriminated against by the parole board denying him parole while granting parole to others similarly situated. Nolan v. Thompson, 521 F.3d 983, (8th Cir. 2008). Nolan was in prison for first-degree murder committed during a kidnapping; although he was sentenced to life imprisonment, he was potentially eligible for parole. Id. at 985. He requested parole from the parole board on several occasions, but the board consistently denied him parole for the same reason: granting Nolan

parole would "depreciate the seriousness" of his crime and the circumstances under which it was committed.  Id. at 986.

In analyzing Nolan's class of one claim, the court stated that "[i]dentifying the difference in treatment is especially important in class-of-one cases for statistical reasons.  In the absence of a large number of disadvantaged people sharing a single characteristic, 'there is no way to know whether the difference in treatment was occasioned by legitimate or illegitimate considerations without a comprehensive . . . canvassing of all possible relevant factors.' "  Id. at 990.  Nolan must, then, "provide a specific and detailed account of the nature of the preferred treatment of the favored class," especially if the defendant was required to exercise broad discretion or balance competing considerations.  Id.

The court held that Nolan had failed to show that the board denied him parole on an irrational basis:  to the contrary, the board consistently stated the same rational reason for denying Nolan parole.  Id.  Further, the court stated that Nolan had presented no evidence to suggest that the board's stated reason for denying parole was pretextual.  Id.  The court refused to infer that the board irrationally discriminated against Nolan simply because he had an excellent record of behavior in prison and that other inmates had committed worse crimes.  Id.  The court denied Nolan's Equal Protection claim, noting that the board is required to exercise discretion and take into account a wide variety of individual factors affecting whether to grant parole.  Id.

The Nolan decision is fatal to Mr. Bell's class of one claims. Although Mr. Bell has presented claims of pretext on defendants' part, he has not provided "a specific and detailed account of the nature of the preferred treatment of the favored class." Nolan, 521 F.3d at 990. Instead, he has only alleged conclusory allegations about the favorable treatment of other inmates.

For example, the court begins with Mr. Bell's assertions regarding his non-receipt of books and magazines. Mr. Bell claims he has been treated differently than other inmates regarding the receipt of donated books under OM 2.3.C.4. This court has determined in section C.1. above in this opinion that the defendants are not entitled to qualified immunity based upon the determination that the manner in which they applied OM 2.3.C.4 to Mr. Bell's donated books from a non-religious source was unconstitutional. The reason Mr. Bell's claim in section C.1. succeeds but his class of one claim based on the same facts fails is that he has presented no evidence that the defendants applied OM 2.3.C.4 differently to inmates other than himself. Such evidence is essential to a class of one claim.

The same can be said for Mr. Bell's claim regarding the rejection of his *Military History* magazine. While Mr. Bell alleges the defendants were unreasonable in their rejection of the magazine and that their rejection of the magazine was in retaliation for his previous lawsuit, notably absent from Mr. Bell's equal protection class of one claim is any indication that any other inmate at SDSP has been allowed to receive that same issue of *Military History*. Absent proof that another inmate was treated more favorably than Mr. Bell by

being allowed to receive the May, 2016, issue of *Military History* while Mr. Bell was not allowed to receive it, his class of one claim cannot survive as to that allegation either.

Next, Mr. Bell claims he was denied equal protection based upon the manner in which prison officials handled the February 1, 2017, chow hall altercation, Mr. Bell's placement in the segregation cell, and the medical treatment he received after the incident. But, as explained elsewhere in this opinion, Mr. Bell has not named any of the actors involved in those incidents as defendants in this lawsuit. As such, it fails on the merits without further analysis.

The next allegation in Mr. Bell's class of one equal protection claim pertains to UC Steinecky's alleged refusal to provide Mr. Bell with grievance forms. But again, UC Steinecky is not a party to this lawsuit. As for Warden Young's role in that factual scenario (responding to Mr. Bell's request for administrative remedy), Mr. Bell has provided absolutely no evidence that, given the same factual situation, any other inmate received treatment or a response from Warden Young that was more favorable than that which Warden Young gave to Mr. Bell. Absent such evidence, this portion of Mr. Bell's class of one claim fails as well.

Finally, Mr. Bell generally alleges that the supervisory defendants are responsible for his class of one equal protection claims because they knew of the wrong and did not intercede, failed to supervise their subordinates, or created a policy or custom that allowed the conduct to occur. This claim for

supervisory liability against Denny Kaemingk, Warden Young, and Jennifer Dreiske fails for a couple of reasons. First, general claims of supervisory liability are insufficient in the context of § 1983. "A supervisor cannot be held liable, on a theory of respondeat superior, for an employee's unconstitutional actions." White v. Holmes, 21 F.3d 277, 280 (8th Cir. 1994). Rather, a supervisor incurs liability for an Eighth Amendment violation when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate indifference toward the violation. Choate, 7 F.3d at 1376. "The supervisor must know about the conduct, and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he or she] might see." Ripson, 21 F.3d at 809.

Second, there can be no supervisory liability if there is no underlying liability. Cole v. Bone, 993 F.2d 1328, 1334 (8th Cir. 1993). If the plaintiff fails to establish a constitutional violation at all, he has no § 1983 claim against those defendants sued as supervisors. Id. Because the court has found there is no liability on any of the underlying class of one Equal Protection claims, so too must the supervisory liability claims based upon the class of one Equal Protection claims be dismissed.

Accordingly, as to Mr. Bell's Equal Protection claims, the court concludes Mr. Bell has failed to prove on summary judgment the violation of a constitutional right. Failing one prong of the qualified immunity analysis, then, results in qualified immunity being applicable to all defendants on this claim. Pearson, 555 U.S. at 236.

**CONCLUSION AND ORDER**

Based upon the foregoing facts, law, and analysis, it is hereby

ORDERED:

1.      The parties did a commendable job briefing the issue and therefore the request for oral argument is denied;

2.      The defendants' motion for summary judgment (Docket 108) is DENIED as to that portion of Mr. Bell's claim regarding the application of OM 2.3.C.4 to Mr. Bell's receipt of books from Parallax Press and Bound Together Bookstore (the as-applied challenge contained in count one of Mr. Bell's amended complaint);

3.      The balance of the defendants' motion for summary judgment is GRANTED.

Dated this 27th day of June, 2018.

BY THE COURT:

_____

VERONICA L. DUFFY
United States Magistrate Judge