UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| SHANE DOUGLAS BELL, | 4:16-CR-04046-VLD |
| Plaintiff, | |
| vs. | |
| DARIN YOUNG, WARDEN, INDIVIDUAL AND OFFICIAL CAPACITY; JENNIFER DREISKE, DEPUTY WARDEN, INDIVIDUAL AND OFFICIAL CAPACITY; SETH HUGHES, UNIT COORDINATOR, INDIVIDUAL AND OFFICIAL CAPACITY; DENNIS KAEMINGK, SECRETARY OF CORRECTIONS, INDIVIDUAL AND OFFICIAL CAPACITY; BOB DOOLEY, DIRECTOR OF PRISON OPERATIONS, INDIVIDUAL AND OFFICIAL CAPACITY; CRAIG MOUSEL, CORRECTIONAL OFFICER, INDIVIDUAL AND OFFICIAL CAPACITY; AND SCO MOISAN, SENIOR CORRECTIONAL OFFICER, INDIVIDUAL AND OFFICIAL CAPACITY, | ORDER ON PLAINTIFF'S PETITION FOR WRIT OF MANDAMUS [DOCKET 160] |
| Defendants. | |

## INTRODUCTION

This matter was before the court on plaintiff Shane Bell's *pro se* complaint pursuant to 42 U.S.C. § 1983.  See Docket No. 1.  On February 17, 2017, the district court, the Honorable Lawrence L. Piersol, appointed counsel to represent Mr. Bell in this matter.  See Docket No. 83.  An amended complaint was thereafter filed by counsel on Mr. Bell's behalf.  See Docket

No. 89.  In December 2017, the case was transferred to this magistrate judge on the consent of all parties.  See Docket No. 102.  While a motion for summary judgment was pending, the parties settled all claims in this matter and moved to dismiss the case with prejudice.  See Docket No. 140.  The court accordingly granted the motion, dismissed the matter with prejudice, and entered judgment on February 5, 2019.  See Docket No. 141.

On October 1, 2019, Mr. Bell moved the court *pro se* for an order enforcing the terms of the settlement against defendants.  See Docket No. 143.  The court entered an order granting in part Mr. Bell's motion on October 31, 2019.  See Docket No. 149.  In his motion, Mr. Bell alleged the South Dakota Department of Corrections ("SDDOC") had retaliated against him in violation of paragraph 3c of the settlement agreement.  See Docket No. 149 at p. 8;  Docket No. 143 at p. 1.  He asserted that prison employees repeatedly discussed within his hearing a plan to have him moved to A-floor, a part of the South Dakota State Penitentiary ("SDSP") used for prisoners who are being disciplined. Docket No. 149 at p. 8; Docket No. 146 at p. 7.  Mr. Bell also alleged prison employees called him names like "snitch," "rat," "lawyer rat," "Buddha rat," "spiritual rat," "crazy," and "retarded."  Docket No. 146 at pp. 2, 7.  Mr. Bell also asserted that prison employees gave other prisoners information about him.  Docket No. 149 at p. 8; Docket No. 143 at p. 2.

The defendants did not deny these allegations.  See Docket No. 149 at p. 8.  Instead, they argued that mere name calling and open discussions of plans to move Mr. Bell, short of taking any action to relocate him, is not

2

actionable as "retaliation."  Id.  In ruling on Mr. Bell's motion to enforce the

settlement agreement, the Court rejected the defendants' reliance on the

narrow legal definition of actionable retaliation under 42 U.S.C. § 1983, finding

that the parties' settlement agreement was not limited to a narrow legal

definition of retaliation.  Docket No. 149 at p. 8.  Instead, the defendants

promised broadly under the terms of the settlement agreement to refrain from

any "unlawful adverse effect" visited upon Mr. Bell by prison officials as a

result of his pursuing the underlying lawsuit.  See Docket No. 140-1 at

p. 2, ¶ 3c.

Because the defendants did not deny Mr. Bell's allegations, which were

supported by his affidavit, the court accepted them as true.  Docket No. 149 at

p. 8.  The court found that Mr. Bell's allegations supported an inference of acts

by defendants and their employees that were designed to harass, worry, and

endanger Mr. Bell's safety among his fellow prisoners.  Id.  Without finding that

these acts constituted unlawful adverse effects, as contemplated in the

settlement agreement, the court found that these actions were not within the

spirit of paragraph 3c of the parties' agreement.  Id.  The court ordered

defendants to reprint paragraph 3c and distribute it to all prison employees

who have contact with Mr. Bell.  The court ordered defendants to ensure that

each such employee signed an acknowledgement that they have read and

understood the provision as it relates to Mr. Bell.  Id. at p. 9.  The court also

ordered the defendants to preserve for three years certain audio recordings

from SDSP concerning Mr. Bell.  Id.  The court denied all other remedies sought by Mr. Bell.  Id.

On December 9, 2019, Mr. Bell filed a motion to appoint counsel (Docket No. 150), which the court, on December 12, 2019, denied, directing Mr. Bell to file a new complaint and pay a new filing fee if he wished to pursue claims on the new matters mentioned in his motion (Docket No. 151).

On February 20, 2020, Mr. Bell filed a motion to appoint a monitor to ensure SDDOC complied with its no-retaliation obligations under the settlement agreement.  See Docket No. 152.  The next day, the court denied Mr. Bell's motion.  See Docket No. 158.

Mr. Bell, again acting *pro se*, has filed a motion seeking a writ of mandamus to enforce the court's October 31, 2019, order and, in turn, the settlement agreement.  See Docket No. 160.  Defendants resist the motion, asserting they have not violated the terms of the agreement.  See Docket No. 163.  Mr. Bell has filed a reply to defendants' response.  See Docket No. 171.  Mr. Bell's motion raises two main issues: (1) are defendants, individually or through SDDOC employees, violating the retaliation provision in the settlement agreement by engaging in certain specific actions towards Mr. Bell, and (2) have defendants met their court-ordered obligation to reprint paragraph 3c from the settlement agreement and distribute it to all prison employees who have contact with Mr. Bell, and to have each such employee sign an acknowledgement that they have read and understood the provision as regards Mr. Bell?

4

## DISCUSSION

**A.    Whether Mr. Bell Is Entitled to Mandamus Relief**

While Mr. Bell's motion is styled as a request for a writ of mandamus, the motion does not specify the statute authorizing its request for mandamus relief.  Nor does the defendants' response address the propriety of this court's exercise of jurisdiction over Mr. Bell's claim for mandamus relief.  The court will therefore assume Mr. Bell has moved the court under the Mandamus Act, 28 U.S.C. § 1361.  Section 1361 reads as follows:

> The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

See 28 U.S.C. § 1361 (2018).

A writ of mandamus is a "drastic" remedy "to be invoked only in extraordinary situations."  Allied Chem. Corp. v. Daiflon, Inc., 449 U.S. 33, 34 (1980) (citations omitted).  Since Marbury v. Madison, 5 U.S. 137 (1803), the law has been clear that a court may issue a writ of mandamus against an officer or employee of the United States *only* in cases where "the plaintiff can establish (1) a clear and indisputable right to the relief sought, (2) the state officer has a nondiscretionary duty to honor that right, and (3) there is no other adequate remedy."  Mitchael v. Colvin, 809 F.3d 1050, 1054 (8th Cir. 2016) (quotation omitted); see also Heckler v. Ringer, 466 U.S. 602, 616 (1984) (A writ of mandamus "is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty.") (citations omitted); Allied Chem. Corp., 448 U.S. at 35

5

("In order to insure that the writ will issue only in extraordinary circumstances this Court has required that a party seeking issuance have no other adequate means to attain the relief he desires, . . ., and that he satisfy the burden of showing that [his] right to issuance of the writ is clear and indisputable.") (internal quotation omitted).  A plaintiff does not have a "clear and indisputable" right to relief in cases where the defendant's duty is discretionary.  Allied Chem. Corp., 449 U.S. at 36 (citing Will v. Calvert Fire Ins. Co., 437 U.S. 655, 666 (1978) (plurality opinion).

But district courts do not have any jurisdiction under 28 U.S.C. § 1361 to compel a state or its officers to perform any duty owed a plaintiff under state law.  Longie v. Spirit Lake Tribe, 400 F.3d 586, 591 (8th Cir. 2005).  See also Winters v. Winters, No. 19-CV-3177-SRN-KMM, 2020 WL 1049145, at *4 (D. Minn. Feb. 11, 2020); Morse v. Vinson, No. 3:09CV00153 JMM, 2010 WL 385945, at *2 (E.D. Ark. Jan. 27, 2010).  This court lacks mandamus authority to compel a state official—as opposed to a *federal* official—to act in a particular manner.  Mr. Bell has not named a single federal employee or agency as a defendant, and he complains only about his treatment by the SDDOC, not any federal agencies or actors.  The Mandamus Act does not give this court power over those entities to issue the orders Mr. Bell seeks.

**B.     Liberal Construal of Mr. Bell's Request for Mandamus Relief**

Although a writ of mandamus should not be issued, this court must construe *pro se* filings liberally.  See, e.g., Topchian v. JPMorgan Chase Bank, N.A., 760 F.3d 843, 849 (8th Cir. 2014).  Based upon the claims raised by

Mr. Bell in his motion, the court construes it as a successive motion for enforcement of the settlement agreement under a breach of contract theory and, as to Mr. Bell's claims about the reprinting and distribution of paragraph 3c. a motion for a finding of civil contempt for failure to comply with the court's October 31, 2019, order.

"Federal courts are courts of limited jurisdiction." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). "The Supreme Court held in Kokkonen that district courts do not have inherent power to enforce a settlement agreement entered into by parties in federal court." Myers v. Richland Cty., 429 F.3d 740, 745 (8th Cir. 2005) (citing Kokkonen, 511 U.S. at 380-81). Because an action to enforce a settlement agreement is a claim for breach of contract, it should be heard in state court unless it has "its own basis for jurisdiction." Kokkonen, 511 U.S. at 378; Myers, 429 F.3d at 745. Although the Kokkonen Court found no basis for jurisdiction where the district court's order did not even mention the settlement agreement, the Court explained:

> [I]f the parties' obligation to comply with the terms of the settlement agreement had been made part of the order of dismissal—either by separate provision (such as a provision "retaining jurisdiction" over the settlement agreement) or by incorporating the terms of the settlement agreement in the order. In that event, a breach of the agreement would be a violation of the order, and ancillary jurisdiction to enforce the agreement would therefore exist.

511 U.S. at 381. See also Adduono v. World Hockey Ass'n, 824 F.2d 617, 621-22 (8th Cir. 1987) (holding that the district court lacked jurisdiction where

it did not incorporate the settlement agreement into the dismissal order or expressly retain jurisdiction to enforce the settlement agreement).

In the absence of an independent basis for federal jurisdiction, "ancillary jurisdiction," as the term is used in Kokkonen, can arise in two different ways. Kokkonen, 511 U.S. at 382. First, a district court can enforce a settlement where the settlement is, "in varying respects and degrees, factually interdependent" with a claim that had been presented for adjudication. Id. at 379. The second way permits judicial enforcement when necessary for the district court "to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." Id. at 380.

Here, the court has independent jurisdiction to enforce the terms of the settlement agreement because the court, in its February 5, 2019, order dismissing the action, expressly retained such jurisdiction. See Docket No. 141. Further, this court has ancillary jurisdiction to enforce the settlement agreement to vindicate its authority and effectuate its decrees. Specifically, in its October 31, 2019, order on Mr. Bell's motion to enforce the settlement agreement, this court ordered the defendants to reprint paragraph 3c of the settlement agreement, distribute it to all SDSP employees who have contact with Mr. Bell, and have each such employee sign an acknowledgement that they have read and understood it. See Docket No. 149 at p. 9. Defendants acknowledge they have not technically complied with this order. Docket No. 163 at pp. 2-5. For these reasons, the court construes Mr. Bell's pleading

8

as a successive motion to enforce the settlement agreement and a motion for a finding of civil contempt and considers his claims on their merits.

## C.   South Dakota Contract Law

As this court explained in its October 31, 2019, order, settlement agreements are contracts.  As such, they are governed by state contract law. Lewis v. Benjamin Moore & Co., 574 N.W.2d 887, 889 (S.D. 1998).  There is no separate federal contract law which would apply under these circumstances in this case to this agreement.  Instead, interpretation of the settlement agreement is governed by South Dakota state law because the agreement was negotiated exclusively in South Dakota by residents of this state.  S.D. Codified Laws § 53-1-4 (2018); Great West Cas. Co. v. Hovaldt, 603 N.W.2d 198, 201 (S.D. 1999).

The interpretation of a contract is a question of law for the court to determine.  Lillibridge v. Meade School Dist. #46-1, 746 N.W.2d 428, 431 (S.D. 2008).  When interpreting a contract, "effect will be given to the plain meaning of its words."  In re Dissolution of Midnight Star, 724 N.W.2d 334, 337 (S.D. 2006).  Courts must "give effect to the language of the entire contract and particular words and phrases are not interpreted in isolation."  Id. (internal citation omitted).  When provisions of a contract conflict, the more specific provision controls the more general provision.  Spiska Eng'g, Inc. v. SPM Thermo-Shield, Inc., 730 N.W.2d 638, 645 (S.D. 2007).  Courts look "to the language that the parties used in the contract to determine their intention." Pauley v. Simonson, 720 N.W.2d 665, 667-68 (S.D. 2006).

9

If the language of the contract is clear and unambiguous, "it is the duty of [the] Court to declare it and enforce it." Id. at 668 (quotation omitted).  But if the contract is ambiguous, then "parol and extrinsic evidence may be utilized 'to show what [the parties] meant by what they said . . . .' " Id. (quoting Jensen v. Pure Plant Food Int'l, Ltd., 274 N.W. 2d 261, 264 (S.D. 1979)).  A contract "is ambiguous when it is fairly susceptible to two constructions." Fall River Cty. v. S.D. Pub. Assur. Alliance, 623 N.W.2d 735, 737 (S.D. 2001).  If a contract is ambiguous, it is construed against the scrivener of the contract—the party who drafted the contract.  Ass Kickin Ranch, LLC v. N. Star. Mut. Ins. Co., 822 N.W.2d 724, 727 (S.D. 2012); Pete Lien & Sons, Inc. v. First. Am. Title Ins. Co., 478 N.W.2d 824, 827 (S.D. 1991).  This is because the "language employed is that of the [scrivener] and it is consistent with both reason and justice that any fair doubt as to the meaning of its own words should be resolved against it." Mut. Life Ins. Co. of N.Y. v. Hurni Packing Co., 263 U.S. 167, 174 (1923).  The scrivener rule of construction applies even when the non-drafting party had the benefit of counsel's review of the document.  Pesicka v. Pesicka, 618 N.W.2d 725, 727 n.2 (S.D. 2000); Clements v. Gabriel, 472 N.W.2d 480, 483 (S.D. 1991).  It also applies when a form contract is supplied by one party.  Hicks v. Brookings Mall, Inc., 353 N.W.2d 54, 56 (S.D. 1984).  However, the court may not seek out a "strained or unusual meaning for the benefit of the" other party. Chord v. Reynolds, 587 N.W.2d 729, 732 (S.D. 1999).

**D.    Mr. Bell's Claims for Relief**

In his request for a writ of mandamus, Mr. Bell makes three specific claims for breach of the non-retaliation provisions of the settlement agreement. First, Mr. Bell alleges SDSP retaliated against him in breach of the settlement agreement by denying him delivery of a legal resource book.  See Docket No. 160 at p. 4.  Second, Mr. Bell alleges SDSP retaliated against him in breach of the settlement agreement by shaking down his cell to take his legal books, legal notes, a legal journal,[1] and other legal work and disclosing their information to the defendants, other prison staff, and inmates at SDSP.  Id. at pp. 4-5.  Third, Mr. Bell claims he is being retaliated against in violation of the settlement agreement because (i) issues of a magazine to which he subscribes were rejected by SDSP for violating the prison's policy against sexually explicit or pornographic material and (ii) prison employees are punishing him by interfering with a Buddhist group Mr. Bell facilitates.  Id. at pp. 7-8.

Mr. Bell has also stated a claim for a finding of civil contempt.  He alleges the defendants violated this court's October 31, 2019, order by failing to exactly perform the court-ordered reprinting of paragraph 3c from the settlement agreement, distributing it to all prison staff who have contact with Mr. Bell, and having them sign an acknowledgment that they had read and understood it.  Id. at pp. 5-6.

---

[1] Mr. Bell alleges this legal journal was taken from him for a period of 8 days. Docket 160 at p. 4.  Mr. Bell sent this legal journal to the Clerk of Court at the United States Courthouse in Sioux Falls, South Dakota, where it remains. Docket No. 162.

Mr. Bell also renews his claims that the defendants have violated paragraph 3c of the settlement agreement because SDSP employees have continued unabated in the conduct at issue in the October 2019 motion to enforce the agreement.  Mr. Bell alleges that, despite this court's October 31, 2019, order, SDDOC employees have continued violating paragraph 3c by repeatedly discussing a plan to relocate Mr. Bell to A-floor, a section of the SDSP used for prisoners who are being disciplined.  Docket No. 160 at p. 3.  Mr. Bell also claims that prison employees are still calling him names like "snitch," "rat," "lawyer rat," and "Buddha rat."  Id.  Mr. Bell claims the perpetuation of this behavior amounts to breach of contract.  Id. at pp. 4, 6.

The defendants deny Mr. Bell's claims and assert he is not entitled to relief because he has not adequately stated claims for retaliation.  See Docket No. 163 at pp. 5-7.  The defendants' argument is misguided.  Mr. Bell is not raising freestanding retaliation claims for violation of his First Amendment Rights.  Instead, Mr. Bell's claims sound in breach of contract and civil contempt.  As this court explained in its October 2019 order on Mr. Bell's motion to enforce the settlement agreement, the defendants agreed not only that Mr. Bell would not be the subject of retaliation, but also that Mr. Bell would be free from any unlawful adverse effect stemming from his prosecution of the underlying lawsuit.  See Docket No. 140-1 at p. 2, ¶ 3c.  The defendants' narrow focus on the legal definition of retaliation is, especially considering the admonitions in this court's October 2019 order, myopic.  The question the court considers is not, as the defendants frame it, whether Mr. Bell was the

12

subject of unlawful retaliation.  Rather, the questions before the court are whether the SDDOC subjected Mr. Bell to unlawful adverse effects, as proscribed by the settlement agreement, because of Mr. Bell's involvement in the underlying lawsuit, and whether the defendants are in contempt of court for violating a court order.

### 1. Breach of Contract Related to the Legal Resource Book

As his first claim for breach of contract, Mr. Bell asserts that the defendants breached the settlement agreement by denying him delivery of a legal resource book.  See Docket No. 160 at p. 4.  Mr. Bell also alleges that, before the settlement, he was able to receive books from the publisher of the denied book but, since the settlement, legal books he buys are rejected.  Id. Despite his general allegation, Mr. Bell gives details about only one book.

The defendants assert that SDSP's rejection of this book has nothing whatsoever to do with Mr. Bell's prosecution of the underlying lawsuit.  See Docket No. 163 at p. 11.  The court agrees.  SDDOC Policy 1.5.D.3, which the defendants attached as Exhibit 16 to their response to Mr. Bell's request for mandamus relief, provides as follows: "Stickers, tape, self-adhesive labels (return address labels), sealing wax and sticky or foreign substances not originally part of the envelope, are not permitted on the envelope."  SDDOC Policy 1.5.D.3, Inmate Correspondence, § IV.2.B.3 (eff. Aug. 21, 2019), Docket No. 163-16 at p. 5.  The policy further states: "Envelopes that do not meet the requirements will be returned unopened to the sender with a brief description of the reason the envelope was rejected."  Id.

Based on the record supplied by the defendants and Mr. Bell, the SDSP mailroom's processing of Mr. Bell's book proceeded according to this policy, and Mr. Bell was notified that the book was returned to sender and why.  The mailroom correspondence rejection notice states, "Return to Sender: Address labels are not allowed[.]"  Def. Ex. 15, Docket No. 163-15 at p. 2.  Mr. Bell then proceeded with administrative review of the decision to return the book to sender; that remedy was ultimately denied.  See Def. Exs. 17-22, Docket Nos. 163-17 through 163-22; Ptf. Ex. 6, Docket No. 160-1 at pp. 34-37.  As stated in the administrative remedy denials, the book was rejected and returned to sender according to SDSP policy because the package containing the book had an adhesive return address label.  Def. Ex. 20, Docket No. 163-20.

The record reflects that the mailroom's rejection of this book was not retaliation or unlawful adverse effect arising from Mr. Bell's pursuit of the underlying lawsuit.  Instead, it was the application of a department-wide policy to Mr. Bell.  The settlement agreement does not insulate Mr. Bell from unfavorable consequences of universal prison policies.  Here, there is no evidence of animus toward Mr. Bell rooted in his prosecution of the underlying lawsuit.  Therefore, the defendants did not violate the settlement agreement by rejecting Mr. Bell's book according to prison policy.

To the extent Mr. Bell is claiming a First Amendment violation based on the rejection of his book, such a claim is outside the scope of this motion to enforce the settlement agreement.  If Mr. Bell wishes to further pursue a claim based on these facts, he must initiate a new case.

14

**2.      Breach of Contract Related to the Shakedowns of Mr. Bell's Cell**

Next, Mr. Bell asserts the defendants breached the settlement agreement because his cell was searched and his legal materials were taken and their information disclosed to the defendants, other prison staff, and other inmates. See Docket No. 160 at pp. 4-5.  In support of his claim, Mr. Bell avers in his affidavit that his legal journal was taken for eight days by SDSP Correctional Officer Denning, who also took legal notes and read Mr. Bell's legal papers and disclosed information to other prison employees and inmates.  See Bell Aff., Docket No. 160-1 at p. 3, ¶ 7.  Mr. Bell avers this took place on August 2, 2020, in blue section on B-floor and was recorded by prison security cameras.  Id.

The defendants assert the shakedown of Mr. Bell's cell was random and not motivated by Mr. Bell's pursuit of the underlying lawsuit.  SDDOC policy 1.3.C.4, Inmate Personal Property, § IV.1.B (eff. Dec. 5, 2018) states, "[i]nmate personal property is subject to search at any time."  "Regular searches of inmate property will be conducted to ensure compliance with property rules and to identify threats to safety or security (See DOC policy 1.3.A.5 Searches – Institutions)."  Id. at § IV.1.B.1.

It appears Mr. Bell is complaining of two discrete searches of his cell, one on June 5, 2020, and another on August 2, 2020.  As for the June 5, 2020, search, Mr. Bell attached an incident report that describes the seizure of, along with other items, five books, at least four or which were legal reference books.  Ptf. Ex. 4, Docket No. 160-1, p. 25.  According to the report, these books were

15

seized because they either had no cover, did not have a SDDOC number or

their SDDOC number had been blacked out.  Id.  Evidence submitted by the

defendants indicates that altered books without covers and books that do not

have SDDOC numbers on them are contraband subject to seizure under

SDDOC policy.  Def. Ex. 24, Docket No. 163-24.  The SDSP administrative

remedy response (id.) to Mr. Bell's institutional grievance (Def. Ex. 23, Docket

No. 163-23) also informed Mr. Bell the books were seized because they were

considered contraband.  Def. Ex. 24, Docket No. 163-24.  "Possession of

contraband by an inmate may result in disciplinary action.  Contraband may

be confiscated, identified and processed, in accordance with approved

institutional practices and procedures[.]"  SDDOC policy 1.3.C.4, Inmate

Personal Property, § IV.1.B.2 (eff. Dec. 5, 2018).

Mr. Bell has offered no facts suggesting these books were seized in

retaliation or as another unlawful adverse effect for his pursuit of the

underlying lawsuit.  Instead, the seizure of Mr. Bell's property from his cell was

in accordance with broadly applied SDDOC and SDSP policies. The defendants

did not breach the settlement agreement by seizing these items.

Mr. Bell also alleges the defendants breached the settlement agreement

by seizing a legal journal from his cell on August 2, 2020.  Ptf. Ex. 4, Docket

No. 160-1 at pp. 22-23.  The journal was returned to Mr. Bell eight days later.

Docket No. 160 at p. 4.  The defendants resist Mr. Bell's allegation, arguing the

journal was seized during a search of Mr. Bell's cell as a possible security risk

because it contained the names of numerous prison staff.  Ptf. Ex. 4, Docket

No. 160-1 at p. 24; Def. Ex. 27, Docket No. 163-27.  SDDOC policy 1.3.C.5, Inmate Forfeiture of Personal Property, § IV.1.A (eff. July 13, 2020), states: "Inmates may be required to forfeit specified personal property items, as directed by staff, for a specified time period . . ., usually for safety, security or punitive reasons in response to negative behavior."  The journal was investigated by the SDDOC Special Investigations Unit and deemed not a security risk, at which point it was returned to Mr. Bell.  Def. Ex. 27, Docket No. 163-27.

Mr. Bell has not presented any facts suggesting SDSP took the legal journal as retaliation for or as an unlawful adverse effect arising from his participation in the underlying lawsuit.  Nor has he shown any reason to distrust the stated reason for seizing the legal journal—i.e., security concern because it contained the names of numerous SDSP employees.  The court notes at least one other court in this circuit has found writings containing the names of prison staff may be security risks.  See Ireland v. Anderson, No. 3:13-cv-3, 2015 WL 12843962, at *2-3 (D.N.D. Dec. 8, 2015), adopted by, 2016 WL 1170978 (D.N.D. Mar. 24, 2016).  SDSP's seizure of Mr. Bell's legal journal amounts to the application of general SDDOC policy to Mr. Bell.  Even if this application adversely affected Mr. Bell, Mr. Bell has not shown that any adverse effect was rooted in animus toward him for pursuing the underlying lawsuit.  SDDOC did not breach the settlement agreement by seizing the legal journal.

Mr. Bell has offered only conclusory evidence that these searches were initiated because of his participation in the underlying lawsuit.  Without any evidence of animus, these searches were lawful under SDDOC policy as "regular searches . . . to ensure compliance with property rules and to identify threats to safety or security."  SDDOC policy 1.3.C.4, Inmate Personal Property, § IV.1.B.1 (eff. Dec. 5, 2018).

However, Mr. Bell has alleged that he suffered retaliation or other unlawful adverse effect because SDSP employees shared information contained in his legal journal and otherwise observed during the searches of his cell with the defendants, other SDSP staff, and other inmates.  Docket No. 160 at pp. 4-5; Bell Aff., Docket No. 160-1 at p. 3, ¶ 7.  Because this claim fits better within the framework of Mr. Bell's general claim breach of contract claim than this specific claim related to the searches of his cell, the court will discuss it in section five, below.

In his reply, Mr. Bell offers some facts suggesting he was treated differently than similarly situated inmates in the course of the August 2, 2020, shakedown of his cell.  Docket No. 171 at pp. 21-22.  To the extent Mr. Bell is stating a claim for a constitutional violation, such a claim is outside the scope of this breach of contract motion.  If Mr. Bell wishes to pursue a constitutional claim related to alleged disparate treatment, he must initiate a new case.

To the extent Mr. Bell is claiming a First Amendment violation based on the SDDOC's alleged interference with his access to the courts, such a claim is outside the scope of this motion to enforce the settlement agreement.  If

18

Mr. Bell wishes to pursue a First Amendment claim based on these facts, he must initiate a new case.

### 3. Breach of Contract Related to Interference with Religious Practices

Next, Mr. Bell asserts he is subject to retaliation and unlawful adverse effects because SDSP is rejecting delivery of certain magazines about Buddhism addressed to Mr. Bell as violative of SDDOC policy against sexually explicit and pornographic material.  See Docket No. 160 at p. 7.  Mr. Bell also claims that SDSP has visited an unlawful adverse effect on him by disrupting the religious activities of a Buddhist group he leads.  Id. at pp. 7-8.  In support of this second claim, Mr. Bell alleges that SDSP employees have interfered with the Buddhist group by letting out members late for religious services or not at all, repeatedly changing where the group meets without informing Mr. Bell, and disrupting the group's observance of religious holidays by changing meals or failing to deliver fresh fruit to the group.  Id.

First, Mr. Bell has not shown that the rejection of certain issues of the *Lion's Roar* magazine arose out of retaliation for his pursuit of the underlying lawsuit.  In support of his claim, Mr. Bell submitted an administrative remedy request dated August 5, 2020, wherein he contested the rejection of the September 2020 issue of *Lion's Roar*.  Ptf. Ex. 11, Docket No. 160-1 at p. 47; Def. Ex. 33, Docket No. 163-33.[2]  The magazine was confiscated for its

---

[2] Although Mr. Bell does not mention any earlier problems receiving his *Lion's Roar* magazines, the defendants have submitted evidence that at least two issues of the magazine were confiscated for violating the SDDOC's pornography policy as early as December 2019.  See Def. Exs. 28 & 31, Docket Nos. 163-28

depiction of naked female breasts in violation of SDDOC policy 1.3.C.8,
Pornography.  Ptf. Ex. 11, Docket No. 160-1 at pp. 49-50; Def. Ex. 34., Docket
No. 163-34.  In his August 5, 2020, grievance, Mr. Bell referenced the decision
of the district court in <u>Sisney v. Kaemingk</u>, Civ. 15-4069, 2020 WL 3514025
(D.S.D. June 29, 2020).  SDSP personnel responded to Mr. Bell's grievance on
August 14, 2020, noting his reference to <u>Sisney</u> and advising him that "as of
now [the SDDOC pornography policy] remains unchanged."  Def. Ex. 35,
Docket No. 163-35.

In <u>Sisney</u>, the district court found the SDDOC policy prohibiting
pornography and sexually explicit material, as written, was unconstitutionally
overbroad, but that it would withstand facial challenge if simple nudity of
adults were removed from its definition of pornographic and sexually explicit
material.  <u>Sisney</u>, 2020 WL 3514025, at *9.  On July 17, 2020, the <u>Sisney</u>
defendants appealed the district court's decision to the Eighth Circuit.  <u>Sisney
v. Kaemingk</u>, 4:15-cv-04069-LLP, Notice of Appeal, ECF No. 170 (D.S.D.).  The
same day, the <u>Sisney</u> defendants moved the district court to stay its June 29
order pending the appeal.  <u>Sisney v. Kaemingk</u>, 4:15-cv-04069-LLP, Mot. to
Stay, ECF No. 175 (D.S.D.).  The district court denied the motion to stay on
August 10, 2020.  <u>Sisney v. Kaemingk</u>, 4:15-cv-04069-LLP, ECF No. 184
(D.S.D.).  After the district court denied the stay, the <u>Sisney</u> defendants moved
the Eighth Circuit to stay the district court order pending appeal.  <u>Sisney v.</u>

---

& 163-31.  However, after a review, SDSP released those magazines to Mr. Bell
on December 20, 2019.  Def. Ex. 30, Docket No. 163-30.

Kaemingk, No. 20-02460, ECF No. 12 (8th Cir.).  The Eighth Circuit denied the

motion on August 27, 2020.  Sisney v. Kaemingk, No. 20-02460, ECF No. 15

(8th Cir.).  As of the entry of this order, the Eighth Circuit appeal in Sisney is

fully briefed and pending oral argument.  SDDOC's revised policy on

pornography, including the alterations recommended in the district court's

June 29, 2020, opinion, came into effect on November 4, 2020.  See SDDOC

policy 1.3.C.8, Pornography (eff. Nov. 4, 2020).

Mr. Bell has not shown that the rejection of the September 2020 issue of

*Lion's Roar* was rooted in animus toward him for pursuing the underlying

lawsuit.  Instead, the record reflects that SDSP was simply applying a

department-wide policy—the validity of which hung in the balance pending the

motions to stay in the district court and Eighth Circuit—to Mr. Bell.  Thus,

Mr. Bell has not shown that the defendants breached the settlement agreement

through retaliation or other unlawful adverse effect by confiscating those issues

of *Lion's Roar* that depict nudity as defined in the old version of the SDDOC's

pornography policy.

Next, Mr. Bell has not shown retaliation or other unlawful adverse effect

in alleged interference with the Buddhist group's activities.  In administrative

remedy requests dated June 29, 2020, and July 14, 2020, Mr. Bell complained

of missed Buddhist group services on June 23, 2020, and July 13, 2020.  Ptf.

Ex. 10, Docket No. 160-1 at p. 45; Def. Exs. 38 & 40, Docket Nos. 163-38 &

163-40.  Mr. Bell claimed the missed services amounted to a violation of his

First Amendment rights and a breach of the settlement agreement.  Id.  SDSP,

in a remedy response signed by Warden Young, stated that both the June 23 and July 13 services did not proceed due to separate administrative miscommunications, not retaliation against Mr. Bell or the Buddhist group. Ptf. Ex. 10, Docket No. 160-1 at p. 46.  See also Def. Exs. 39 & 41, Docket Nos. 163-39 & 163-41.

Nothing in the record submitted by the parties shows that the missed Buddhist group meetings were due to animus toward Mr. Bell for his pursuit of the underlying lawsuit.  Rather, the record shows these events were discrete instances of miscommunication within SDSP.  While these miscommunications may have adversely affected Mr. Bell, the settlement agreement does not serve to protect Mr. Bell from all adverse effects.  Absent any evidence that any adverse effects to Mr. Bell arose from his participation in the underlying lawsuit, the defendants have not breached the settlement agreement by interfering with the Buddhist group's religious services.

Mr. Bell also alleges the defendants breached the settlement agreement by changing the room where Buddhist group services are held.  Docket No. 160 at pp. 7-8.  Mr. Bell offers no evidence in support of his claim that this location change was intended to punish him by disrupting the religious activities of the Buddhist group.  The defendants dispute Mr. Bell's assertion, presenting evidence that the Buddhist group has been allowed to use the same room since July 2020.  Mertens-Jones Aff., Docket No. 166 at p. 4, ¶ 10.  Before July 2020, the Buddhist group was asked to change rooms in order to accommodate

the needs of another religious group at SDSP that needed more space. Id. at ¶ 11.

The defendants also submitted an administrative remedy request from Mr. Bell dated August 24, 2020, wherein he complained the room the Buddhist group uses remains empty on Tuesday nights, but the group was moved to another location. Def. Ex. 44, Docket No. 163-44. In response, SDSP informed Mr. Bell that no group is entitled to any particular room and groups are placed in rooms according to facility needs. Def. Ex. 45, Docket No. 163-45.

Based on the record submitted by the parties, there is no evidence that Mr. Bell has been retaliated against or suffered unlawful adverse effects from SDSP's changing the room where the Buddhist group holds its religious services. The record reflects that the room change was in service of facility demands, not arising from Mr. Bell's participation in the underlying lawsuit.

Lastly, Mr. Bell asserts that the defendants breached their obligations under the settlement agreement by changing or failing to deliver fresh fruit for Buddhist religious holidays. Docket No. 160 at p. 8. The defendants have submitted record evidence of one instance where the Buddhist group was unintentionally not provided a fruit tray they had ordered. In an informal resolution request dated December 9, 2019, Mr. Bell complained that, on December 8, 2019, the Buddhist group did not receive a fruit platter they planned to eat on December 8, 2019, in observance of Buddha's Enlightenment. Def. Ex. 42, Docket No. 163-42. Mr. Bell complained that the group had paid $67.50 for the platter. Id. On December 19, 2019, SDSP

23

personnel responded to Mr. Bell's remedy request.  Def. Ex. 43, Docket
No. 163-43.  SDSP acknowledged that the Buddhist group did not receive the
fruit platter they had paid for and issued a refund for the purchase price.  Id.
According to Tammy Mertens-Jones, Cultural Activities Program Manager at
SDSP, the non-delivery of the fruit platter was "totally inadvertent" and due to
kitchen staff forgetting to pick up the fruit from a local merchant.  Mertens-
Jones Aff., Docket No. 166 at p. 6, ¶ 18.  According to Ms. Mertens-Jones, this
was an isolated incident, and, except for the fruit platter, the Buddhist group
received the "holiday meal" for Buddha's Enlightenment.  Id.

     Based on the record submitted by the parties, SDSP's non-delivery of the
fruit platter was unintentional, and Mr. Bell has not shown that it was
motivated by or arose from his pursuit of the underlying lawsuit.  Therefore,
the non-delivery of the fruit platter was not retaliation or unlawful adverse
effect as proscribed by the settlement agreement.

     To the extent Mr. Bell is claiming a First Amendment violation based on
the SDDOC's alleged interference with his religious activities, such a claim is
outside the scope of this motion to enforce the settlement agreement.  If
Mr. Bell wishes to pursue a First Amendment claim based on these facts, he
must initiate a new case.

     **4.    Civil Contempt Related to the Defendants' Court-Ordered
            Obligation To Secure from Certain Employees a Signed
            Acknowledgement of Paragraph 3c**

     Next, Mr. Bell seeks enforcement of this court's order to defendants
regarding paragraph 3c of the settlement agreement.  Mr. Bell asserts that the

defendants failed to satisfy their obligations under the court's October 31,

2019, order, which directed them as follows:

> ORDERED that defendants shall reprint paragraph 3c from the
> settlement agreement and distribute to all prison employees who have
> contact with Mr. Bell.  Each such employee must sign an
> acknowledgement that they have read and understood the provision as
> regards Mr. Bell.

Docket No. 149 at p. 9.

The defendants do not claim they have technically complied with this

order, and the record shows they have not.  Instead, the defendants claim they

have substantially complied with the order by distributing to every SDDOC

employee—not just those at SDSP who have contact with Mr. Bell—a

memorandum exhorting staff to comply with SDDOC's Staff Code of Ethics

policy and not retaliate against inmates for pursuing lawsuits or complaints

against the department or state.  See Def. Ex. 50, Docket No. 163-50.  The

memo was from Defendant Warden Young and sent on February 21, 2020.  Id.

The memo does not name Mr. Bell.  Id.  According to Warden Young's affidavit,

each SDDOC employee was required to read the memo and electronically mark

it as read.  See Young Aff., Docket No. 164 at p. 3, ¶ 10.  The defendants do not

address why they did not remind SDDOC employees of their non-retaliation

policy until February 21, 2020, nearly four months after the court's October

2019 order.

Paragraph 3c of the settlement agreement states:

> Retaliation.  The SDDOC agrees and acknowledges that, after the
> dismissal of the present lawsuit, based on this Settlement
> Agreement and Mutual Release, it will continue to adhere to its
> long-standing practice or policy of not subjecting any inmate to

25

> retaliation as a result of his/her having filed a lawsuit against the
> State.  Plaintiff, therefore, will not be subject to retaliation, or any
> other unlawful adverse effect, arising from or relating to his
> participation in this lawsuit, including but not limited to
> statements he made or positions he advocated in its prosecution.

Docket No. 140-1 at p. 2.

Warden Young's memo, with language lifted verbatim or in substantial

part from paragraph 3c in bold type, states as follows:

> The following memo is intended to serve as another reminder that
> DOC expects from its staff unfailing honesty, respect for the dignity
> and individuality of human beings and commitment to professional
> service.  All DOC staff members are expected to continue to
> conduct themselves in a manner consistent with the *Staff Code of
> Ethics* policy, and to maintain a work environment free from
> discrimination.  All staff members remain responsible for treating
> fellow staff, offenders and the public with dignity and respect.
> Staff shall, as in the past, not practice discriminatory, harassing or
> offense [sic] behavior nor condone it in others.
>
> As you know, **the DOC has a long-standing practice and policy
> of not subjecting any inmate to retaliation as a result of
> his/her having filed a lawsuit, or complaint of any kind,
> against the State**.  We will continue to adhere to said practice and
> **no inmate may be subject to retaliation, or other unlawful
> adverse effect, arising from his/her participation in any
> lawsuit or any complaint or grievance against the DOC or
> the State**.

Docket No. 163-50.

"One of the overarching goals of a court's contempt power is to ensure

that litigants do not anoint themselves with the power to adjudge the validity of

orders to which they are subject."  Chi. Truck Drivers v. Bhd. Labor Leasing,

207 F.3d 500, 505 (8th Cir. 2000) (citing United States v. United Mine Workers,

330 U.S. 258, 290 n.56 (1947)).  As the Supreme Court observed in United

Mine Workers, "what the Constitution now fittingly calls the 'judicial power of

26

the United States' would be a mere mockery" without the power to punish contempt of court.  330 U.S. at 290 n.56.

In a civil consent case before a magistrate judge, the magistrate judge may exercise the civil contempt authority of the district court.  28 U.S.C. § 636(e)(4) (2018).  "Civil contempt may be employed either to coerce the defendant into compliance with a court order or to compensate the complainant for losses sustained, or both."  <u>Chi. Truck Drivers</u>, 207 F.3d at 505 (citation omitted).  A party seeking a civil contempt judgment bears the initial burden of proving, by clear and convincing evidence, that the alleged contemnors violated a court order.  <u>Jake's, Ltd., Inc. v. City of Coates</u>, 356 F.3d 896, 899-900 (8th Cir. 2004).  "Court orders are to be complied with in *letter* and *spirit*[.]"  <u>United States v. Dinwiddie</u>, 885 F. Supp. 1299, 1304 n.3 (W.D. Mo. 1995) (quoting <u>McGuffin v. Springfield Hous. Auth.</u>, 662 F. Supp. 1546, 1547 (C.D. Ill. 1987)).  Here, it is undisputed that the defendants have not complied with the letter of the October 2019 order.  Most pointedly, but among other things, the defendants failed to comply with the court order when they did not require staff to sign an acknowledgement that they understood paragraph 3c *as regards Mr. Bell*.

Yet, substantial compliance with a court order may be a defense to civil contempt.  <u>Ford Motor Co. v. B & H Supply, Inc.</u>, 646 F. Supp. 975, 1005 (D. Minn. 1986) (citing <u>Gen. Signal Corp. v. Donallco, Inc.</u>, 787 F.2d 1376, 1379 (9th Cir. 1986)).  <u>See also</u> <u>United States v. Hefti</u>, 688 F. Supp. 1367, 1370 (E.D. Mo. 1988); <u>Fogie v. Thorn Ams., Inc.</u>, No. 3-94-359, 1997 U.S. Dist.

27

LEXIS 23562, at *10 (D. Minn. Feb. 19, 1997).  "If a violating party has taken

all reasonable steps to comply with the court order, technical or inadvertent

violations of the order will not support a finding of civil contempt."  Gen. Signal

Corp., 787 F.2d at 1379 (quotation omitted).

      Here, the defendants have shown they have taken all reasonable steps to

comply with the court order.  The February 21, 2020, memo effectively

paraphrases the language of paragraph 3c of the settlement agreement.

Requiring SDDOC employees to electronically mark the memo as "read" serves

substantially the same function as requiring them to sign an

acknowledgement.  Sending the memo to all SDDOC employees accomplishes

the goal of notifying those employees who engage Mr. Bell of the department's

non-retaliation policy.  And the defendants have stated a valid penological

interest in Mr. Bell's safety for keeping his name off the memo.  As Warden

Young states in his affidavit, "SDSP has a penological interest in the safety and

security of every inmate.  As such, efforts are made to limit documents

produced and dispersed within the institution that name or draw attention to

any specific inmate or group of inmates, as any document could potentially be

seen by inmates."  See Young Aff., Docket No. 164 at p. 4, ¶ 15.  "Documents of

any kind which single out an inmate or group of inmates can make them a

target for violence or extortion from other inmates or inmate groups."  Id.

at ¶ 16.

Based on the submissions of the parties, the court is satisfied that defendants have substantially complied with the October 2019 order. Therefore, Mr. Bell's request for a finding of civil contempt is denied.

### 5.  Ongoing Retaliation and Unlawful Adverse Effects in Violation of the Settlement Agreement

Mr. Bell claims he has been subject to ongoing retaliation and unlawful adverse effects arising from his pursuit of the underlying lawsuit in violation of paragraph 3c of the settlement agreement.  The language of paragraph 3c is encompasses more behavior than the narrow legal definition of retaliation.

> The SDDOC agrees and acknowledges that . . . it will continue to adhere to its long-standing practice or policy of not subjecting any inmate to retaliation as a result of his/her having filed a lawsuit against the State.  Plaintiff, therefore, will not be subject to retaliation, or other unlawful adverse effect, arising from or relating to his participation in this lawsuit, including but not limited to statements he made or positions he advocated in its prosecution.

Docket No. 140-1 at p. 2.

Mr. Bell has alleged that the SDDOC has continued visiting retaliation for and unlawful adverse effects related to his participation in the underlying lawsuit in violation of the settlement agreement and despite this court's October 31, 2019 order.  Specifically, Mr. Bell has alleged SDSP staff have continued openly discussing moving him off B-floor and calling him such names as "snitch," "rat," "cry baby," and "crazy" to other prison staff and inmates.  Bell Aff., Docket No. 160-1 at p. 6, ¶¶ 13-14.  Mr. Bell also claims SDSP employees have shared with other inmates information about him and his legal work.  While many of Mr. Bell's allegations of name-calling and

discussions about moving him off B-floor lack specific factual content, he does describe several specific events.

Mr. Bell submitted an affidavit from Anthony Reyes, another inmate at SDSP, in which Mr. Reyes avers that he has heard staff, including Corporal Boul, Unit Coordinator Maranowski, and Corporal Bell call Mr. Bell names like "snitch," "rat," "Buddha rat," and "lawyer rat."  Reyes Aff., Docket No. 160-1 at p. 8, ¶ 3.  Mr. Bell also submitted an administrative remedy request dated May 21, 2020, where he complained that SDDOC staff continue to retaliate against him by threatening to move him to A-floor, causing him anxiety through intimidation and harassment.  Ptf. Ex. 3, Docket No. 160-1 at pp. 11-12.  Although Mr. Bell does not identify which SDDOC staff were discussing moving him to A-floor, he alleges that he brought his concerns to Unit Manager Hughes.  Id., Docket No. 160-1 at p. 13.  Mr. Bell further complained in a May 4, 2020, administrative remedy request that these discussions occurred almost daily in the mornings and evenings.  Id. at Docket No. 160-1 at p. 17.

In the May 4, 2020, grievance, Mr. Bell described several incidents of alleged retaliation or unlawful adverse effect arising from the underlying lawsuit.  First, he stated that, on the morning of March 17, 2020, he was in the utility room in Blue Section of B-floor changing mop water and getting cleaning supplies when another inmate entered the utility room and Corporal Boul stood in the doorway.  Ptf. Ex. 3, Docket No. 160-1 at p. 18.  The other inmate asked Corporal Boul to shut and lock the utility room door with Mr. Bell and himself inside for ten minutes.  Id.  According to Mr. Bell, it was obvious the

30

other inmate wanted to assault him in the utility room.  Id.  As stated by

Mr. Bell, "[i]t took Corporal Boul about a minute or so to decide and verbally

state[,] 'There would be too much blood.' "  Id.

Mr. Bell described another instance on March 8, 2020, where

Correctional Officer Denning accused Mr. Bell of looking at her funny during

commissary.  Id. at p. 19.  According to Mr. Bell, Officer Denning then

repeatedly threatened to send Mr. Bell to A-floor because he looked at her

funny.  Id.  Mr. Bell asserted that Officer Denning has a grudge against him

because he files grievances about her allegedly harassing behavior.  Id.

at p. 20.

In information resolution requests dated November 16, 2019, and

December 13, 2019, Mr. Bell complained that numerous prison employees,

including Officers Denning, Timmer, and Perret, discuss moving him off B-floor

on a nightly basis.  Ptf. Ex. 5, Docket No. 160-1 at pp. 27, 30.  Mr. Bell

asserted this behavior was intended to harass him for exercising his legal

rights.  Id.

In December 2019, SDSP responded to an administrative remedy request

where Mr. Bell alleged he heard Officer Moisan state, "Something has to be

done about Bell."  Ptf. Ex. 7, Docket No. 160-1 at p. 38.  The administrative

response stated that this information had been referred to the appropriate

authorities and that internal SDSP staff matters are not discussed with

inmates.  Id.

In his reply, Mr. Bell asserts Officer Denning, Corporal Boul, Unit Coordinator Maranowski, and Officer Westenkircher are among those who continue calling him names like "rat," "snitch," "lawyer rat," and "Buddha rat." Docket No. 171 at p. 3.  Mr. Bell also asserts Corporal Boul confronted Mr. Reyes about the affidavit he signed in support of Mr. Bell's request for mandamus relief.  Id.; Bell Reply Aff., Docket No. 172 at pp. 6, 8, ¶¶ 14, 21. Mr. Bell further alleges that he has heard Unit Coordinator Maranowski, Officer Westenkircher, Officer Denning, Corporal Boul, and Corporal Balsavage call him such names as "rat," "snitch," and "crybaby."  Docket No. 171 at p. 4; Bell Reply Aff., Docket No. 172 at p. 6, ¶ 15.  Mr. Bell further alleges that, on September 29, 2020, a mentally ill sex offender diagnosed with paranoid schizophrenia was moved into his cell.  Docket No. 171 at pp. 7, 24.  Mr. Bell asserts that another inmate threatened to kill Mr. Bell after he submitted prison grievances and sent out legal mail.  Id. at pp. 17-18.  Mr. Bell claims he later heard this inmate tell Officer Denning, "I did my part!"  Id.  According to Mr. Bell, this inmate has been given preferential treatment by prison staff.  Id.

Mr. Bell also claims he heard Officer Westenkircher state, "I hate him!" with regard to Mr. Bell around 7:47 a.m. on September 20, 2020, while talking about wanting to move Mr. Bell off B-floor.  Docket No. 171 at p. 17.  According to Mr. Bell, Officer Westenkircher later stated Mr. Bell was "talking about his goddamn case!"  Id.; Bell Reply Aff., Docket No. 171 at p. 7, ¶ 18.  At around 12:36 p.m. the same day, Mr. Bell claims Officer Westenkircher stated, "he's a rat," about Mr. Bell to others on B-floor.  Id.

32

Mr. Bell further alleges that, on certain listed dates and times, SDSP staff called him "rat" over the radio: September 14, 2020, around 12:38 p.m.; September 18, 2020, around 1:51 p.m.; September 18, 2020, around 7:47 p.m.; September 20, 2020, around 8:48 a.m.; and September 21, 2020, around 3:14 p.m.  Docket No. 171 at p. 20; Bell Reply Aff., Docket No. 172 at p. 3, ¶ 6. Mr. Bell also asserts SDSP talked over the radio about relocating him on September 9, 2020, around 6:45 p.m.  Id.

Mr. Bell submitted the affidavit of Mark Stricherz, another inmate at SDSP, along with his reply.  Mr. Stricherz avers in his affidavit that he has heard discussions by SDSP staff on B-floor, including Corporal Boul, Unit Coordinator Maranowski, and Officer Denning, where they spread negative rumors about Mr. Bell and repeatedly bring up the underlying lawsuit, grievances, and legal work, and treat him poorly in front of other inmates.  See Stricherz Aff., Docket No. 173 at p. 3, ¶ 7.  Mr. Stricherz also avers these SDSP personnel do not like Mr. Bell because of his prison grievances and the underlying lawsuit.  Id.

Both Mr. Bell and Mr. Stricherz described an instance on October 3, 2020, when Unit Coordinator Maranowski shook down Mr. Bell's cell and allowed another inmate—the same person Mr. Bell claims asked Officer Boul to lock them both in a utility closet—to stand in the doorway and discuss information about Mr. Bell.  Bell Reply Aff., Docket No. 172 at pp. 8–9, ¶ 21; Stricherz Aff., Docket No. 173 at p. 2,¶¶. 4-6.  According to Mr. Stricherz, Mr. Bell told several inmates to get away from his cell and let Unit Coordinator

33

Maranowski carry on with the shakedown, but Unit Coordinator Maranowski told Mr. Bell to go back to work and not worry about what they were doing. Stricherz Aff., Docket No. 173 at p. 2, ¶ 6.

Mr. Bell also submitted an affidavit from Joseph Smalls with his reply. Mr. Smalls was Mr. Bell's cellmate and, as of the affidavit's writing, had been for three months.  Smalls Aff., Docket No. 174 at p. 1, ¶ 1.  According to Mr. Smalls, he witnessed multiple SDDOC employees treat Mr. Bell in a retaliatory or vindictive manner as a result of his participation in the underlying lawsuit, which Mr. Smalls avers is a common topic of conversation within and between the SDSP prison and staff populations.  Id. at pp. 1-2, ¶¶ 2-3.

Lastly, in his reply, Mr. Bell asserts Officer Denning disclosed information contained within the legal journal she seized from Mr. Bell's cell on August 2, 2020, to various people at SDSP.  Docket No. 171 at p. 12.  Mr. Bell asserts he was told by inmate Tad Blackburn that "people know about your journal" and that the name-calling, as described elsewhere herein, worsened after Officer Denning seized the journal from Mr. Bell's cell.  Id.

The defendants, for their part, broadly deny all assertions by Mr. Bell that he has been retaliated against as of result of the underlying lawsuit.  See Docket No. 163 at p. 5.  The defendants argue Mr. Bell cannot state a prima facie claim for retaliation.  Id.  But the question is not whether Mr. Bell can state a claim for retaliation.  The question is whether the defendants have breached the settlement agreement by retaliating or visiting other unlawful

34

adverse effects on Mr. Bell because of his participation in the underlying lawsuit.  Even if the court were to entertain Mr. Bell's motion as a request for mandamus relief, the relief requested is the enforcement of the parties' contract, not some other remedy tied to a freestanding retaliation claim.  The defendants' preoccupation with a narrow legal definition of retaliation is confused.  But there is some merit to the defendants' position.  The settlement agreement prohibits only those unlawful adverse effects that arise from Mr. Bell's participation in the lawsuit; therefore, even if SDDOC has visited some adverse effect upon Mr. Bell, they have violated their contractual obligations only if such adverse effect arose from Mr. Bell's pursuit of his legal remedies.

Yet, the defendants have offered scant evidence to dispute Mr. Bell's version of events.  They specifically dispute only three of Mr. Bell's claims. First, the defendants argue that Mr. Bell's claim about SCO Moisan's "something has to be done about Bell" statement must be false because SCO Moisan did not work on November 4, 2019, the day when Mr. Bell says the statement was made.  Dreiske Aff., Docket No. 165 at p. 3, ¶ 8; Def. Ex. 14, Docket No. 163-14.  The record evidence the defendants cite is an administrative remedy response, dated nearly 10 months after the date when Mr. Bell claims SCO Moisan made the comment, stating that SCO Moisan did not work on November 4, 2019.  Def. Ex. 14, Docket No. 163-14.  Mr. Bell, in his reply, doubles down on his claim, suggesting that whatever records defendants have that indicate SCO Moisan was absent that day could be

incorrect because prison staff sometimes swap shifts and that the prison security cameras would show that SCO Moisan, along with Officer Stevens and Captain Pitchford, was present on November 4, 2019.  Bell Reply Aff., Docket No. 172 at p. 5, ¶ 11.

Second, the defendants resist Mr. Bell's claims that SDSP staff have repeatedly threatened to move him off B-floor.  SDSP has, the defendants argue, repeatedly assured Mr. Bell that there has been no talk or discussions about relocating him to another housing unit.  Docket No. 163 at p. 10.  But the documents the defendants cite are old.  The defendants have offered no evidence to show that, since this court entered its October 31, 2019, order enforcing the settlement agreement, SDSP and SDDOC staff have assured Mr. Bell that he will not be moved.  Where the allegations in Mr. Bell's current motion concern SDDOC employees' conduct since October 31, 2019, Unit Manager Hanson's October 9, 2019, affidavit has little bearing.  And even if the defendants did provide relevant evidence that Mr. Bell has been assured by certain SDDOC staff that he will not be moved, the defendants have offered no evidence to refute Mr. Bell's specific allegations that other employees, including Officers Denning, Westenkircher, Timmer, and Perret, have repeatedly and openly discussed moving him off B-floor.  Ptf. Exs. 5 & 6, Docket No. 160-1 at pp. 27, 30; Bell Reply Aff., Docket No. 172 at p. 7, ¶ 18.

Lastly, the defendants dispute that SDDOC staff, including Officer Boul and Unit Coordinator Maranowski, called Mr. Bell names and discussed moving him off B-floor on June 26, 2020.  Dreiske Aff., Docket No. 165 at p. 3,

¶ 5.  In response to administrative remedy requests Mr. Bell submitted (Def. Exs. 1 & 3, Docket Nos. 163-1 & 163-3), SDDOC staff talked with Officer Boul and Unit Coordinator Maranowski, who denied that any such communication took place (Def. Exs. 2 & 4, Docket Nos. 163-2 & 163-4).

In arguing that there has been no "adverse action" on the part of SDDOC simply because the department has not tried to relocate Mr. Bell, the defendants have clearly missed the meaning of the court's October 2019 order:

> [T]he settlement agreement is not limited to a narrow legal definition of "retaliation." Instead, defendants promised under the terms of the settlement agreement to refrain from any "unlawful adverse effect" visited upon Mr. Bell by prison officials as a result of his filing the instant lawsuit. See Docket No. 140-1 at p.2, ¶3c. This is far broader than the narrow legal concept of "retaliation." Because defendants do not deny that this behavior is taking place, the court accepts as true Mr. Bell's allegations, supported by his affidavit. See Docket No. 147. *Those allegations support an inference of acts by defendants and their employees that are designed to harass, worry, and endanger Mr. Bell's safety among his fellow prisoners*. This may very well constitute "unlawful adverse effects."

Docket No. 149 at p. 8 (emphasis added).

"Unlawful adverse effects" may include acts by SDDOC staff that harass or worry Mr. Bell, so long as those acts are motivated by Mr. Bell's participation in the underlying lawsuit.  The defendants' contention that "verbal threats do not constitute adverse action sufficient to support a claim of retaliation" (Docket No. 163 at p. 10) is irrelevant to the claims Mr. Bell has raised.  As explained exhaustively herein, the issue is not whether Mr. Bell has stated a standalone claim for retaliation; it is whether the SDDOC has breached its contract with Mr. Bell.  In the context of the parties' contract, the defendants

have offered no reason why verbal threats may not constitute retaliation or unlawful adverse effect.

Just as the defendants do not address what constitutes "unlawful adverse effect," neither does Mr. Bell.  Borrowing from Title VII employment litigation, where the similar terms "unlawful adverse action" and "adverse employment action" are frequently litigated, an adverse effect is one that produces a material change in in an employee's working situation.  Higgins v. Gonzales, 481 F.3d 578, 584 (8th Cir. 2007) (noting that "[m]inor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage" are not material changes).  In the context of a harassment lawsuit under Title VII, a plaintiff must show that the systemic bad treatment is severe and pervasive enough to have affected a term or condition of employment.  Id. at 588 (finding a pattern of "harsh and unprofessional" treatment, including transfer to a new office with an unwilling supervisor and formal complaints against the employee, did not rise to adverse employment action because there was no material employment disadvantage). The sporadic name-calling and bad-natured teasing alleged by Mr. Bell, even if true, do not amount to an unlawful adverse action.  Defendants have not disciplined him because of his participation in the lawsuit—they have not, for instance, placed him in solitary confinement or transferred him to a less favorable floor or correctional facility.  In short, Mr. Bell has not shown adverse action by defendants.

Further, Mr. Bell's allegations, taken as true, do not show that the defendants have violated their contractual obligation to not retaliate against or visit other unlawful adverse effects upon him arising from his participation in the underlying lawsuit.  Especially where the Supreme Court has warned against "unnecessarily perpetuating federal courts' involvement in prison administration affairs" (Shaw v. Murphy, 532 U.S. 223, 224 (2001)), Mr. Bell's claims do not show that the defendants have breached the contract.

Further, the actions alleged by Mr. Bell are, in relation to the underlying lawsuit, too remote in time to suggest they were motivated by or arose from it. Mr. Bell filed his complaint in the underlying lawsuit on April 5, 2016.  This case has been closed since February 5, 2019, when this court entered judgment on the parties' joint motion to dismiss.  Mr. Bell revived this case in October 2019 with his motion to enforce the settlement agreement.  Now, Mr. Bell has alleged he was, in late 2019 and throughout 2020, still being retaliated against and unlawfully adversely affected due to the underlying lawsuit.  Just as this court held in its June 27, 2018, opinion on the defendants' motion for summary judgment, "the temporal relationship is not strong" between the alleged retaliation and unlawful adverse effects and Mr. Bell's constitutionally protected activity.  Bell v. Young, No. 16-04046-VLD, 2018 WL 3148385, at *38 (D.S.D. June 27, 2018) (citing Haynes v. Stephenson, 588 F.3d 1152, 1156-57 (8th Cir. 2009)).  Although this is not a freestanding retaliation issue, there must still be some nexus in time to show that the defendants' alleged actions were motivated by Mr. Bell's participation

39

in the underlying lawsuit.  If Mr. Bell has not shown that SDDOC's actions were motivated by his participation in the underlying lawsuit, then he has not shown that defendants have breached the settlement agreement.  Here, Mr. Bell's participation in the underlying lawsuit ended when the case was dismissed on February 5, 2019, at least 10 months before the adverse effects alleged by Mr. Bell.  This large amount of time erodes the inference that SDDOC's alleged conduct was motivated by Mr. Bell's participation in the underlying lawsuit.

It bears repeating that the question before the court is whether the defendants have breached the settlement agreement.  Therefore, the court considers not whether Mr. Bell has been the subject of any retaliation, but *only* whether Mr. Bell has been the subject of retaliation or unlawful adverse effects *arising from his participation in the underlying lawsuit,* which ended on February 5, 2019.  This is because the settlement agreement protects Mr. Bell only from those retaliatory acts of unlawful adverse effects arising from his participation in the underlying lawsuit.  Considering the large amount of time between the conclusion of his case and the alleged actions of SDDOC, Mr. Bell has not shown that any adverse effects he has suffered arise from his participation in the underlying lawsuit.  Therefore, Mr. Bell has not shown that the defendants breached the settlement agreement.

To the extent Mr. Bell is claiming constitutional violations based on new instances of alleged retaliation by SDDOC employees, such claims are outside

the scope of this motion.  If Mr. Bell wishes to pursue new claims based on these facts, he must initiate a new case.

## CONCLUSION

Based on the foregoing facts, law and analysis, it is hereby ORDERED that Mr. Bell's motion for mandamus relief [Docket No. 160] is denied in its entirety.  If Mr. Bell wishes to pursue new claims, he must file a new complaint and pay a new filing fee.

DATED December 4, 2020

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge